**ANDERSON–FRIBERG, Inc. et al. v. JUSTIN R. CLARY & SON, Inc. et al.**

United States District Court
S. D. New York.
May 22, 1951.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for plaintiffs, Porter R. Chandler, and Roger R. Clisham, New York City, of counsel.

William Standard, New York City, for New York Granite Cutters International Assn., Edward J. Malament, New York City, of counsel Representing the New York Branch.

Nass & Nass, New York City, for Lawrence Cantolli and Domenick De Nigris, Inc., and appearing specially for Trylon Memorial Studio.

Walter M. Colleran, New York City, for the Granite Cutters International Ass'n and Michael De Santis.

Gabrielli & Gabrielli, New York City, for Ideal Monumental Works, Inc., Ralph Gabrielli, New York City, of counsel.

Adrian P. Burke, New York City, for Cemetery Stone Handlers, Erectors & Granite Yard Helpers Local 106.

Ero K. Djerf, New York City, for J. R. Pitbladde, Inc.

Wait, Wilson, Newton & Campbell, New York City, for Justin R. Clary & Son, Inc., Frederick W. Newton, New York City, of counsel.

Norman Geiger, Brooklyn , N. Y., for Isidore Sprung, appearing specially.

Warren J. Heeg, Forest Hills, N. Y., for T. F. Crough & Sons, Inc.

Maxwell W. Passerman, New York City, for Riverside Studios, Inc.

Jacob W. Friedman, New York City, for A. Ottavino, Joseph Weiss Co., Inc., and Tedeschi & Tedeschi Co., Inc.

WEINFELD, District Judge.

This is an action under the Sherman and Clayton Acts for treble damages and for a permanent injunction.[1] The plaintiffs charge that the defendants are engaged in a conspiracy and combination to restrain and monopolize interstate commerce by agreeing with each other that all finishing work on granite stone imported into the Greater New York area shall be done in New York City and that no finished or partly finished stone shall be brought into the area from Vermont or elsewhere.

The present motion is one for a preliminary injunction. Several defendants have moved for a dismissal of the complaint for failure to state a claim upon which relief may be granted, and one applies for summary judgment or judgment on the pleadings. Other defendants have made motions addressed to the venue and jurisdiction of the Court.

The plaintiffs are engaged in the manufacture and sale of granite which is quarried in the vicinity of Barre, Vermont, and the action for a permanent injunction is also brought on behalf of all the manufacturers in that area, totaling some one hundred ten, who also sell their products in the New York City area.

When the rough granite is mined from the quarries in Barre, it is either sold and shipped as rough stock or it is manufactured into markers, monuments, memorials, mausoleums and building stone by machinery and local skilled labor.

The die is that portion of the monument, memorial or marker above the base or foundation which usually bears an inscription, design or carving. A substantial part of the plaintiffs' business consists of either finishing or partly finishing the dies. Finishing has many variations, including polishing, shaping, sculpturing, carving, grading and lettering. The product, finished and partly finished, is then shipped by plaintiffs from Barre, Vermont, to dealers or wholesalers in the Greater New York area where it may be completed, if required, by the addition of inscriptions, designs, lettering and dates. It is the so-called finishing and partly finishing activities on the monuments and other processed granite items which represents the heart of the present controversy.

The plaintiffs' charge in substance is that these defendants are embarked upon a conspiracy whereby no Barre granite on which any finishing work has been done outside the New York City area may be brought in either from Vermont or other sources except where the longest dimension of the stone is equal to or more than six feet, referred to as the "six foot rule;" that it is planned to restrict the sale and shipment of granite from plaintiffs and others into this area to unfinished slabs or rough stock.

The defendants fall into two groups—unions and dealers. The defendant New York Branch, Granite Cutters International Association of America, American Federation of Labor, referred to as the "Cutters Union," is a local branch of the Granite Cutters International Association

1. 15 U.S.C.A. §§ 1, 2, Sherman Act; 15 U.S.C.A. §§ 15, 26, Clayton Act.

(also a defendant in this action). Its members are engaged in finishing and lettering work in the Greater New York area. The defendant Cemetery Stone Handlers, Erectors and Granite Yard Helpers Local 106, referred to as the "Setters Union," consists of cemetery workers in the same area. Individual officers and agents of these unions have also been joined as defendants.

The second group of defendants consists of thirteen independent granite manufacturers and dealers in the Greater New York area, employers, most of whom are engaged in monument work and others in building construction. Some have contracts with both the Setters and the Cutters Unions; others have entered into agreements with but one of the unions; at least one defendant has no contractual relations with either union and another defendant repudiates the agreement entered into with one of the unions, claiming it was signed by an employee without authority.

There are approximately two hundred seventy-five dealers, wholesale and retail, and manufacturers of granite and other stone in the Greater New York area (hereinafter referred to as "dealers" or "employers") who engage the services of members of the union-defendants. All of these dealers, including the thirteen named as defendants herein, purchase stone from other areas. Approximately ninety per cent of such stone is granite, of which fifty per cent is quarried, finished or partly finished in the Barre area by plaintiffs and then shipped and sold to the New York City dealers. Almost all the granite so shipped into this area consists of dies of six feet or less in length and width. During 1950, finished and partly finished granite of $2,000,000, representing a considerable part of that manufactured in the Vermont region, was imported into the Greater New York area. A number of dealers, but not all, are equipped to perform finishing work on granite products brought into the area.

The plaintiffs' grievances stem from two provisions contained in collective labor agreements proposed by the Setters and the Cutters Unions to the dealers. Both the Setters and the Cutters agreements are the typical collective labor contracts relating to wages and hours, vacations and working conditions, and the two clauses subjected to attack were originally proposed by the unions prior to the expiration date of the existing agreements, March 31, 1951. The provisions which plaintiffs charge as being intended to accomplish the objectives of the alleged combination, conspiracy and attempt to monopolize are, according to its complaint:

"Section 3. (Cutters Union)

"All employers hereby agree to do all the work set forth in the first paragraph of the preamble to this agreement in their own shops provided the die is not longer than six feet. In all other instances no work will be done outside the jurisdiction of the New York Branch if the working conditions, rate of pay and hours of work are below the standards set out in the within agreement."

The "work" referred to is cutting, carving, dressing, polishing, sawing and setting all granite, hardstone and artificial granite.

"Section 10. (Setters Union)

"It being the policy of the industry to standardize and uphold an equitable standard of living in the industry, in order to effectuate this purpose it is agreed between the signatories of this agreement as follows:

"(a) That the complete cemetery memorial where the die is six feet wide or less, shall be fabricated within the territory encompassed by this agreement.

"(b) It is further understood that in the event that the working standard, wages and conditions existing in areas other than the area covered under this agreement, shall equal the working conditions, wages and conditions existing in the area covered by this agreement, then and in that event the employers shall have the option to fabricate complete memorials under six feet in these areas.

"(c) For the purpose of this agreement, it is understood that fabrication shall mean any work on the raw granite after process of sawing granite blocks into slabs.

"(d) * * *

"(e) * * *"

Plaintiffs also charge that some defendant-dealers have publicly voiced approval of the "six foot rule" and have encouraged the defendant-unions to insist upon its adoption. The motivation on the part of these dealers is alleged to be that the exclusion of finished and partly finished Barre granite products will compel smaller dealers who are unequipped to do finishing work either to buy finished granite products from those New York City dealers equipped to perform finishing work or else be forced out of business. The names of the dealers who have made such statements and to whom such purpose is attributed are not set forth although the union representatives to whom the request for adoption of the rule was made are named.

The plaintiffs say that the above clauses establishing the "six foot rule" have already achieved their intended result; that since April 1, 1951, interstate shipments, finished or partly finished from Barre into the Greater New York area have ceased; they are unable to obtain transportation for their products because employees of carriers refused to transport to New York and there has been interference with deliveries; they have been unable to fill any of the substantial backlog of orders received from granite dealers in the New York City area; they have received no orders from defendant-dealers since April 1, 1951.

Plaintiffs contend that they are suffering irreparable injury due to inability to accept orders or secure transportation for orders previously accepted and unfilled; that some of their skilled labor forces are out of employment due to the closing of the New York market and if the current situation continues this force may be dissipated; they have lost a substantial portion of their market with losses mounting daily and they face the destruction of substantial capital investment and assert it is doubtful if the combined assets of the defendants will be sufficient to meet a treble damage recovery in the event they

are successful. Accordingly, they seek a preliminary injunction restraining the defendants from performing and enforcing any agreement or understanding requiring that granite finished in whole or in part shall not be shipped in interstate commerce from Vermont into the New York area or that such work be done within the Greater New York area or preventing such finishing from being done in Vermont or elsewhere.

The plaintiffs contend that the facts of this case fall four-square within the holdings in Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct 1533, 89 L.Ed. 1939 and United Brotherhood of Carpenters etc., v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973. In the Allen Bradley case, out-of-state manufacturers of electrical equipment brought an action under the Sherman Act against a local union. The joint activities of the union, local contractors and manufacturers had closed the New York City market to plaintiffs' products. To secure desirable working conditions and employment opportunities, the union by legitimate use of strikes and boycotts obtained closed shop agreements with the contractors and manufacturers. The agreements provided that the manufacturers would sell only to contractors employing members of the local; the contractors agreed to purchase only from manufacturers who had closed shop agreements with the union. The hard core of the ruling is found in the question posed by the Court: " * * * a very narrow one—do labor unions violate the Sherman Act when, in order to further their own interests as wage earners, they aid and abet business men to do the precise things which that Act prohibits?" 325 U.S. at page 801, 65 S.Ct. at page 1536.

And its answer: "Employers and the union did here make bargaining agreements in which the employers agreed not to buy goods manufactured by companies which did not employ the members of Local No. 3. We may assume that such an agreement standing alone would not have violated the Sherman Act. But it did not stand alone. It was but one element in a far larger program in which contractors and manufac-

turers united with one another to monopolize all the business in New York City, to bar all other business men from that area, and to charge the public prices above a competitive level. It is true that victory of the union in its disputes, even had the union acted alone, might have added to the cost of goods, or might have resulted in individual refusals of all of their employers to buy electrical equipment not made by Local No. 3. So far as the union might have achieved this result acting alone, it would have been the natural consequence of labor union activities exempted by the Clayton Act from the coverage of the Sherman Act. Apex Hosiery Co. v. Leader, supra, 310 U.S. 503, 60 S.Ct. 997, 84 L.Ed. 1311. But when the unions participated with a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation was created not included within the exemptions of the Clayton and Norris-LaGuardia Acts." 325 U.S. at page 809, 65 S.Ct. at page 1539.

The above quotation explains why the unions, like the plaintiffs, rely upon the Allen Bradley and kindred cases for support. They say the decision is narrowly confined to the facts therein and that it holds that a demand by a union relating to wages and hours made in the course of collective bargaining negotiations and imposed by the weight of union strength and economic sanctions, is protected unless the demand was instigated by employers or non-employee groups to achieve a monopoly or restraint of trade and to raise prices and gain market control. They assert that conspiratorial action between the groups is the underlying rationale of those cases.

The defendants vigorously dispute the plaintiffs' charge of the existence of a combination or conspiracy to violate the antitrust laws. The opposition goes beyond categorical denials. There is a sharp conflict of the basic facts upon which plaintiffs must rely to sustain the allegations of the complaint.

The Cutters Union says that Section 3 of its agreement was unilaterally initiated by it in the sole interest of its membership. On December 27, 1950, some three months before the expiration of its then current contracts, it submitted to the two hundred seventy-five granite dealers in the New York area a proposed agreement with respect to wages and working conditions and its demands included Section 3. Negotiations, following prior practice, were carried on with a committee representing all the employers. The employers resisted Section 3 and other proposals, whereupon dissension developed in their ranks and the negotiating committee was dissolved. The union then negotiated with individual employers. These efforts were not too successful. A great majority of dealer-employers remained unpersuaded and the union called a strike on April 1, 1951, following the termination of the existing contract. Since that date, out of a total of two hundred seventy-five dealers, only thirteen have consented to the union's demands and signed the agreement, including Section 3 as originally proposed. To induce the still reluctant employers to sign the proposed contract, the union rephrased Section 3 to read as follows: "All employers agree that except for honing and polishing the face and back of rough stock, no work set forth in the first paragraph of the preamble to this Agreement will be done outside the jurisdiction of the New York Branch if the working conditions, rate of pay, and hours of work are below the standards set out in the within agreement."

This modification applies retroactively to the agreements previously signed by the several employers.

The thirteen who signed the cutters agreement containing the clause are defendants in this action. The union members are still on strike as to the others. It is claimed, however, that many New York City dealers are ready to sign with the union but have not done so because they are threatened with this law suit if they do.

The union concedes that the purpose of the amended clause is the same as that of the original Section 3. The principal purpose of the clause, says the union, is to

maintain the wages, hours and working conditions of its membership in this jurisdiction and to protect them against the competition of the products of workers in the Barre and other areas where depressed and substandard working conditions allegedly prevail. They acknowledge that while the plaintiffs as employers in Barre, Vermont, have contracts with the local cutters there who belong to the same International, the strength of the employers has been so great as to reflect itself in a substantial differential in wages, hours and working conditions. The union charges that this disparate situation and activities of manufacturers in Barre has through the years shrivelled its membership, many of whom had to seek employment in other industries. Thus, its basic contention is that the proposal was independently initiated and advanced in the full exercise of its economic power for the betterment of its membership—and not in the interests of employers or any other non-employee group nor is it related to price fixing.

The contentions of the Setters Union, although likewise denying a conspiracy, combination or aiding or abetting an unlawful purpose, are somewhat different. It admits attempting to impose Section 10 of its proposed agreement upon employers in the Greater New York area. However, its efforts, too, met with little success for only seven of the two hundred seventy-five dealers, after separate negotiation with each, accepted the proferred clause, which was only one of thirteen other proposals advanced by the union for inclusion in a new contract upon the expiration of the old on March 31, 1951. Failing to secure an agreement from the vast number of its employer-dealers, it called a strike, following which on May 4, 1951, an agreement was signed and its members returned to work. This, says the union, was the result of arms-length negotiations. Many of its original thirteen demands, including the very restrictive clause on which plaintiffs rely for their claim to relief, were not realized and are not included in the renewal agreement. The complaint concedes the withdrawal of this clause from the contract but alleges that this defendant has refused to give any assurance that it will not participate in the alleged illegal agreement or reactivate it in the future. (Complaint, Paragraph 15–1/2).

The union urges that the very fact that only seven out of a total of two hundred seventy-five dealers accepted the proposal when it was advanced and no others have signed since, is repugnant to a conspiratorial charge.

The remaining defendant-dealers each deny participation in a conspiracy or combine and state that the unions through the exercise of their power imposed the "six foot rule" upon them. Their individual situations show considerable variation. Seven of them signed the setters proposal containing Section 10 and practically all signed the cutters contract with Section 3. Certain dealers are not engaged in monument work or else such work is an insignificant part of their businesses. Some deal primarily or exclusively in building stone used in general construction, including public buildings and public works. Others operate so-called studios for the sale of monuments and contend that they submitted to the unions' demands although employing no setters or cutters because it was of little significance in view of the nature of their businesses; others say they signed "reluctantly" and "under duress" or "against will" to avoid boycotts and picketing of their premises or affiliated businesses, or interference with construction contracts where time schedules had to be observed under penalities. One of these defendants strongly endorses the clause as a justifiable effort to improve the working conditions of his employees; another contends that he gave orders to some of the plaintiffs who deliberately, and not because of any action on the part of the defendants, had failed to make deliveries.

The defendant-unions also contend that they are involved in a bona fide local labor dispute with their employers, the New York City dealers, relating to wages, hours and conditions of employment and so the Court lacks jurisdiction to enjoin

them under the Norris-LaGuardia[2] and Clayton Acts[3]. The plaintiffs reply that they are suing the defendants for violation of the anti-trust laws, that they are not in employer-employee relationship with the defendant-unions and that the controversy between them and the defendants does not involve sheltered activities of unions.

It would seem that immunity from injunctive action is dependent upon a factual determination. If there is conspiratorial action as proscribed by the Allen Bradley case, it would not be protected by the Norris-LaGuardia or Clayton Acts. On the other hand, if it be found that the union was acting in its own self-interest and for the betterment of its members, free and independent of a combination with non-labor groups intent upon violating the anti-monopoly laws, it would be immunized against injunctive action. The applicability of those Acts as we have seen under the Allen Bradley case turns on a fact determination. This is patently clear from the ruling of that case: "Our holding means that the same labor union activities may or may not be in violation of the Sherman Act, dependent upon whether the union acts alone or in combination with business groups." 325 U.S. at page 810, 65 S.Ct. at page 1540.

Thus not only are the basic issues of fact controverted but with counsel for the contending litigants relying in the main upon the Allen Bradley case, it is apparent there is substantial disagreement as to its applicability or the outer limits of its authority. With the asserted legal rights of the plaintiffs to ultimate relief put in substantial issue on both legal and factual grounds, no preliminary injunction should be granted. The law is well settled that the extraordinary relief of a preliminary injunction, which in advance of trial in effect gives a party the full relief to which he might be entitled after a full trial, will not issue under such circumstances. Behre v. Anchor Insurance Co., 2 Cir., 297 F. 986; Hall Signal Co.

v. General Ry. Signal Co., 2 Cir., 153 F. 907; United States v. Adler's Creamery, Inc., 2 Cir., 107 F.2d 987. The Clayton Act underscores the applicability of the principles which govern the granting of injunctive relief. 15 U.S.C.A. § 26.

All issues of law and fact should await full inquiry upon a trial. Accordingly, the motion for a preliminary injunction is denied.

However, a prompt trial is indicated in view of the importance of this controversy, the nature of the issues, the fact that the pending strike has paralyzed the industry here and to a substantial degree in the Barre, Vermont area, resulting in widespread unemployment and substantial loss to employees and employers alike, the possible interference in this critical period with necessary construction on public projects, the plight of families who have been and will be prevented from dedicating monuments to the memory of beloved ones. Martin v. National League Baseball Club, 2 Cir., 174 F.2d 917. Upon the argument of the motion all counsel except one, and since then he, too, indicated readiness to proceed to trial. The case is preferred and placed at the head of the calendar for trial on the 5th day of June, 1951 for immediate trial.

There remain for consideration various cross motions made by several defendants.

Motions by Cutters Union and Others to Dismiss Complaint for Failure to State a Claim upon which Relief can be Granted.

The complaint charges conspiracy and combination on the part of the dealers, the defendant-unions and others (1) in restraint of trade and commerce; (2) attempting to and monopolizing trade and commerce among the several states and sets forth the objectives of the conspiracy and the means to effect them and, therefore, is sufficient under the Allen Bradley and Carpenters cases. Whether such a conspiracy, or aiding and abetting the employers is proved, or whether the acts

2. 29 U.S.C.A. § 101 et seq.

3. 29 U.S.C.A. § 52, Section 20 of the Clayton Act.

complained of are established to be activity by the union acting alone and prompted by a desire to get and hold jobs for its membership at good wages and under high working standards, must await determination upon the trial. The motion is denied.

So, too, is the motion to dismiss made by the Setters Union, denied. Although the complaint admits the withdrawal of Section 10 as proposed by this union, the general allegation of conspiracy and acting in concert to achieve the objectives of the conspiracy and the charge that defendant may reinstate the clause and that it may again participate in the alleged conspiracy, are sufficient to withstand the motion to dismiss.

Motions made by other defendants to dismiss on the same grounds as those urged by the Cutters Union, are likewise denied.

### Defendant Cutters Union Motion for Summary Judgment and Judgment on the Pleadings.

■ It is clear that the same factual issues in dispute which lead to a denial of the plaintiffs' motion for a preliminary injunction preclude the granting of defendant's motion for summary judgment. The policy of the Courts is to avoid trial by affidavits. Arnstein v. Porter, 2 Cir., 154 F.2d 464, 471.

These motions are denied.

### Motions to Dismiss for Improper Venue.

■ Certain individual defendants residing in the Eastern District of New York who were served with process there moved to vacate service and to dismiss on the ground of improper venue, relying upon Section 1391(b) of Title 28 U.S.C.A.: "A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought in the judicial district where all defendants reside, except as otherwise provided by law."

A venue provision is also contained in the Clayton Act, which authorizes suit "in any district court of the United States in the district in which the defendant resides or is found or has an agent, * *." 15 U.S.C.A. § 15.

Section 1392(a) of Title 28 provides: "Any civil action, not of a local nature, against defendants residing in different districts in the same State may be brought in any of such districts."

Since an anti-trust suit is not of a "local nature" venue as to the defendants is proper in the Southern District of New York.

■ The special venue provisions contained in the anti-trust laws were intended as an enlargement of venue and to broaden the choice of a forum available to plaintiffs in anti-trust actions. United States v. Scophony Corporation of America, 333 U.S. 795, 804, 68 S.Ct. 855, 92 L.Ed 1091; Abrams v. Bendix Home Appliances, Inc., D.C., 96 F.Supp. 3.

■ The general venue provisions now contained in New Title 28, Sections 1391 et seq., effective September 1, 1948, may be considered supplementary to, and not in limitation of, the venue provisions contained in the anti-trust laws and other special statutes. Thus, for example, the forum non conveniens provision, Section 1404(a) of Title 28, has been held applicable to anti-trust suits and the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. United States v. National City Lines, Inc., 337 U.S. 78, 69 S.Ct. 955, 93 L.Ed. 1226; Ex parte Collett, 337 U.S. 55, 69 S.Ct. 944, 959, 93 L.Ed. 12C7.

The motions are denied.

### Motions by Granite Cutters International Association to Dismiss the Complaint for Improper Venue.

■ Service of process was made upon the International Union by personal service upon Michael De Santis, a member of its Executive Council, in the Eastern District of New York, where he resides. The International urges that the action should be dismissed because it does not come within "any of the permissive venue provisions of the anti-trust laws." The contention is that it maintains its only office in Quincy, Massachusetts, from which it conducts all its business. The nature and extent of its activities, its relationship to its Locals and the duties of De Santis are put at issue. The questions which need necessarily be

considered cannot be determined upon the present papers.

Accordingly, this motion is denied with leave to renew following the taking of depositions, or, as has been suggested by counsel for the plaintiffs, after a reference to a Master to take proof on this issue. Abrams v. Bendix Home Appliances Inc., D.C., 92 F.Supp. 633. In view of the early date set for trial this matter requires immediate attention but failure to conclude the inquiry in time shall not be deemed an excuse to delay the trial.

Settle order on one day's notice.