**INTERCONTINENTAL CONTAINER TRANSPORT CORPORATION,**
Plaintiff,

v.

**NEW YORK SHIPPING ASSOCIATION,** Inc. and International Longshoremen's Association, Defendants.

No. 69 Civ. 5654.

United States District Court,
S. D. New York.
March 23, 1970.

On Motion for Reargument
April 13, 1970.

Zwerling & Zwerling, New York City, for plaintiff.

Lorenz, Finn & Giardino, New York City, for defendant New York Shipping Association, Inc.

Gleason & Miller, New York City, for defendant International Longshoremen's Assn.; Julius Miller, New York City, of counsel.

MANSFIELD, District Judge.

In this action for a declaratory judgment, an injunction and treble damages against defendants for alleged Sherman Act violations destructive of plaintiff's business, plaintiff's motion for a preliminary injunction is countered by cross-motions to dismiss the complaint and for summary judgment by the two defendants.

Defendant New York Shipping Association (hereinafter "NYSA") is a New York membership corporation composed of approximately 140 steamship companies, stevedores and other waterfront employers in the Port of New York. It is the certified collective bargaining representative for its employer-members, and helps to administer and enforce the provisions of the Master Contract between its members and the International Longshoremen's Association (hereinaf-

ter "ILA"). Defendant ILA is the certified collective bargaining representative for the longshoremen's locals whose members handle the loading and unloading of freight on the piers of the Port of New York. The ILA constitutes a single bargaining unit for the entire port, and bargains with the NYSA and its members only.

Plaintiff Intercontinental Container Transport Corporation (hereinafter "ICTC") is a newcomer among the stevedoring and warehousing companies on the Port of New York scene. It engages in the specialized business of warehousing and consolidating '"containerized" ocean freight at a waterfront facility in Port Newark, New Jersey. It does not itself load and unload ships. However, it "stuffs" cargo containers (i. e., packs them) at its premises located about two blocks from the docks and delivers the stuffed containers to the dock for loading on ships. It also picks up packed containers that have been unloaded from ships onto the dock and takes them to its premises where it "strips" them (i. e., removes cargo from the container) for forwarding of the contents to consignees.

Cargo containers of the type handled by ICTC have, ever since their introduction in the late 1950's, been the focus of disputes between longshoremen and shippers over the development of automated cargo handling. A decade of intermittent labor warfare in the Port of New York over the issue was finally ended in 1968 by the negotiation of a General Cargo Agreement, pursuant to the Master Contract negotiated in that year between the NYSA and the ILA, which includes three special Rules on Containers. These Rules provide, in essence, that all containers meeting certain criteria (which, it appears, describe a large part of the containers passing through the Port of New York) must be stuffed and stripped on a waterfront facility, pier or dock by ILA longshore labor, paid and employed at longshore rates under the terms and conditions of the General Cargo Agreement. Any

member of the NYSA taking delivery of containers which have passed over the docks without being so stuffed or stripped at the waterfront facility, pier or dock is liable under Rule 3(e) to a fine of $250 for each such container.

Plaintiff ICTC received a temporary license from the Waterfront Commission of New York Harbor on July 24, 1969, authorizing it to engage in the performance of services in the warehousing and consolidating of ocean freight. Its attempts to operate a container station facility under that license have, however, run afoul of the containerization Rules of the General Cargo Agreement. Pursuant to Rule 3(e) one of its important customers has been fined $5,000 for ICTC's alleged violations of the Rules, and at least one shipping line has refused to handle containers stuffed or stripped by ICTC, presumably to avoid the imposition of similar fines. Plaintiff indicates that if such fines and boycotting continue it will be driven out of business. It has attempted, without success, to join the NYSA and to negotiate a collective agreement with the ILA.

In imposing the fines referred to above, the NYSA-ILA Container Committee, which is charged with the enforcement of the Rules on Containers, did not specify precisely which provisions of the Rules plaintiff had violated. It appears, however, that ICTC was found either to have stuffed or stripped the offending containers with non-ILA labor, or to have done so elsewhere than at a "waterfront facility, pier or dock," or both.

ICTC insists that in fact its stuffing and stripping is done with ILA labor, and that its premises do meet the requirement of the Rules on Containers that stuffing and stripping be done on a "waterfront facility, pier or dock." The main thrust of ICTC's complaint, however, is that the NYSA, by refusing to admit it to membership, and the ILA, by refusing to negotiate a collective agreement with it, are engaged in a conspiracy to prevent it from competing with the stevedore members of the NYSA,

and that the adoption and enforcement of the Rules on Containers was intended and is designed to perpetuate the NYSA's monopoly over the servicing of containers in the Port of New York.

Prior to the commencement of its operations under the temporary stevedoring license from the Waterfront Commission, ICTC applied for membership in the NYSA. No definite action was taken on its application until September 9, 1969, two weeks after the granting of the license. On that date Alexander Chopin, the chairman of the NYSA, informed ICTC that its application had been disapproved by the Association's Board of Directors because its business was confined to warehousing and the stuffing and stripping of containers, and did not extend to the normal stevedoring functions, performed by the general stevedores who qualify for membership in the Association, of loading and unloading ships at deep-sea piers and terminals. Six months previously, on March 13, the Association had advised ICTC that it could not qualify for membership as an "associate" member of the NYSA both because its services were not performed at the port's deep-sea piers and terminals and because it did not employ waterfront employees covered by collective bargaining agreements negotiated with the ILA by the NYSA.

In an effort to remedy the latter ground for denial of membership, i. e., ICTC's lack of a collective bargaining agreement, plaintiff has made repeated efforts to negotiate a contract with certain ILA locals whose members it already hires on an informal basis. While the ILA has indicated its willingness to enter into a "warehouse collective bargaining agreement" with ICTC, it refuses to negotiate a "deep-sea agreement" with plaintiff. The union takes the position that so long as ICTC is not a member of the NYSA, longshoremen working for plaintiff would not receive the seniority rights, pension benefits and guaranteed annual wage provided for in the Master Contract between the NYSA and the ILA locals. Counsel for the

ILA urged upon oral argument the additional ground that since plaintiff's business premises were not located immediately on the piers and docks of Port Newark, the union, which is strongly oriented to dockside operations, would be unable to police plaintiff's use of ILA labor and to assure itself that no outside workers were being employed. For ICTC's present purposes a "warehouse collective bargaining agreement" is useless, since once it agrees to have its premises treated as a warehouse rather than as a "waterfront facility", any containers coming from its premises would have to be restuffed and stripped by ILA longshore labor in accordance with the Rules on Containers in order to avoid fines under Rule 3(e).

Apparently in an effort to meet the ILA's objection that longshoremen working for plaintiff do not qualify for benefits under the Master Contract as long as ICTC is not a member of NYSA, ICTC applied on September 15, 1969, for permission to participate as an affiliate of the NYSA–ILA Pension Trust Fund by contributing to the various benefits provided under the NYSA–ILA Master Contract, submitting contributions for that purpose by certified check. On September 26 the secretary of the Fund advised plaintiff that while certain nonmembers of the NYSA were allowed to become participating employers under the Pension Plan, this provision applied only to employers who had previously negotiated underlying collective bargaining agreements with the ILA (presumably these are the same employers who qualify only for "associate" membership in the NYSA: the marine carpenters, clerks, etc. performing services at the piers and terminals and covered by ILA contracts). Furthermore, plaintiff was advised by the Fund that the federal courts have held that employee benefit funds may not accept contributions from any employer absent an underlying written collective agreement.

At this point plaintiff ICTC was understandably frustrated. The NYSA was refusing it regular membership be-

cause it did not perform the normal stevedoring operations of loading and unloading ships at piers, and refusing it associate membership because it did not have a contract with the ILA. The ILA, on the other hand, was refusing it a contract because (1) it was not a member of NYSA, and (2) it did not perform its operations on the piers or docks. Both the NYSA and the ILA in turn prevent it from continuing its operations by imposing fines on shippers using its services. Furthermore ICTC is thus prevented fron conducting stuffing and stripping operations despite the fact that (1) it is licensed by the Waterfront Commission of New York Harbor and performs its operations within the Newark-Port Authority Marine Terminal complex, its premises being located therein only two blocks from the waterfront; (2) it hires ILA longshoremen to do its stuffing and stripping, and pays them at full General Cargo Agreement rates; (3) it is ready and willing to contribute to the NYSA-ILA Pension Trust Fund; and (4) many stevedore-members of the NYSA are engaged, like itself, in stuffing and stripping containers, in addition to their other stevedoring operations.

On August 13, 1969, ICTC filed refusal-to-bargain charges against the ILA with the Regional Director of the NLRB, who refused to issue a complaint in the manner on the grounds that in the absence of any demand for recognition by a union, and subsequent recognition of the union by an employer, there is no obligation on the union to bargain or enter into any kind of agreement with the employer. On September 12, ICTC filed further charges against the ILA, alleging that in entering into and enforcing the provisions of the Rules on Containers, the ILA was encouraging customers of ICTC to refuse to do business with it and was agreeing with the NYSA that the latter's members should refuse to deal with ICTC, in violation of §§ 8(b) (4) (B) and 8(e) of the National Labor Relations Act. Again the Regional Director refused to issue a com-

plaint, finding that the containerization provisions of the Master Contract were valid work preservation provisions, designed to protect the traditional work jurisdiction of the longshoremen. Plaintiff's appeals from these determinations are currently pending before the General Counsel of the NLRB.

Concurrently with its attempts to procure administrative redress, ICTC commenced an action in the Supreme Court of New York against the NYSA and United States Lines, one of its members, which was removed to this court on September 8, 1969. The basis of the complaint was that the NYSA, by refusing to handle containers stuffed and stripped by ICTC, was seeking to prevent newcomers such as ICTC from establishing or continuing to operate a stuffing and stripping operation that competed with the business of NYSA members, thereby illegally restraining commerce and improperly interfering with plaintiff's right to do business. The injunctive relief sought would have prevented defendants from refusing to handle containers stuffed and stripped by ICTC; barred the imposition of fines upon ICTC under Rule 3(e) of the Rules on Containers; and restrained the defendants from publicizing their claims that ICTC did not employ proper labor personnel for its stuffing and stripping operations.

A motion to dismiss the complaint was granted by Judge Murphy on November 25, on the ground that plaintiff's invocation of the jurisdiction of the NLRB over essentially similar claims, by the filing of its unfair labor practice charges, had preempted the district court's jurisdiction.

The complaint in the instant action was filed on December 23, seeking injunctive relief and treble damages against the NYSA and the ILA on Sherman Act antitrust grounds. Plaintiff moves herein for a preliminary injunction, seeking in essence to enjoin the defendants from enforcement against ICTC of the Rules on Containers as currently interpreted by the NYSA-ILA

Container Committee. Both defendants cross-move for dismissal of the complaint under Rules 12(b) (1) and (6); defendant ILA moves in addition for summary judgment in its favor.

■■■ Before a preliminary injunction will issue the party seeking it must demonstrate the likelihood that he will ultimately prevail upon the merits, and that he will suffer greater irreparable injury from denial of injunctive relief than any hardship to the opposing party from the granting of such relief. Clairol Incorporated v. Gillette Company, 389 F.2d 264 (2d Cir. 1968); Unicon Management Corp. v. Koppers Company, 366 F.2d 199, 204 (2d Cir. 1966); Dino DeLaurentiis Cinematografica, S. p. A. v. D–150, Inc., 366 F.2d 373 (2d Cir. 1966). However, the burden of showing probable success is less where the balance of hardship tips decidedly towards the party requesting temporary relief.

"In such a case, the moving party may obtain a preliminary injunction if he has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation. Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 205 (2 Cir. 1966); Dino De-Laurentiis Cinematografica, S. p. A. v. D–150, Inc., supra; Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir. 1953)." (Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir. 1969).

The purpose of such preliminary relief is to preserve the status quo or "last actual noncontested status" of the parties, pending a final determination of the merits. Warner Bros. Pictures, Inc. v. Gittone, 110 F.2d 292, 293 (3d Cir. 1940); Westinghouse Electric Corp. v. Free Sewing Mach. Co., 256 F.2d 806, 808 (7th Cir. 1958).

Turning to the question of whether probable cause has been shown in this case, we believe that plaintiff has clearly shown the existence of serious, substantial and difficult questions under the federal antitrust laws, which are fair ground for more deliberate investigation. Disregarding for the moment the defenses that are based on res judicata, Labor Board preemption, and the Norris-LaGuardia Act, we find it difficult to see any reasonable basis for the NYSA's refusal to admit plaintiff to membership. If the NYSA were merely a private or social club, it could, of course, pick and choose its members at will. But the NYSA is an industry-wide employer-representative engaged in negotiating and contracting with the ILA with respect to the only available labor force pertaining to the loading and unloading of ships for the entire Port of New York, including the stuffing and stripping of containers used in such operations. As such it is quasi-public in nature. Where an applicant for membership, who is lawfully engaged in some or all of such operations, is willing to employ ILA labor upon existing group contract terms and conditions and to abide by all other rules of the Association, refusal of membership appears to have the purpose of precluding it from competing with the existing 140 members of the Association. For this reason his application cannot lightly be refused or denied without sound reasons.

Here the sole reason offered by the NYSA for refusing membership to ICTC is that ICTC "does not engage in the traditional work of loading or unloading ships at deep sea and piers and terminals" (Chopin Aff., Jan. 26, 1970, Par. 26). It is undisputed, however, that it does engage in some of the operations conducted by members of the NYSA, i. e., stuffing and stripping of containers for marine transportation, that these operations are carried on by it within the Newark-Port Authority Terminal complex, about two blocks from the waterfront, and that it employs ILA labor at group contract rates both to stuff containers that are then transported by it to the pier for loading aboard ship, and, in reverse, upon unloading of containers from the ship to the pier, to transport them to its nearby

premises for stripping. This would seem to qualify it as an "associate member" of the NYSA, which the NYSA itself defines as follows:

"Any person, firm or corporation engaged in activities related to pier or ship operations and employing waterfront employees covered by collective bargaining agreements negotiated by this association * * *." 1

Although the NYSA may in the past, before the containerization issue was settled with the ILA, have construed the foregoing definition as referring to other types of activity (e. g., loading, unloading, marine carpentry, clerking, etc.), we cannot overlook the fact that containerization has resulted in the development of a new type of activity on the part of NYSA members and their ILA labor force, i. e., stuffing and stripping containers, which has been the subject of a contract between the parties. Indeed, the ILA itself states under oath that "longshoremen represented by the ILA have been stuffing and stripping containers for many years" (Gleason Aff., Jan. 24, 1970, Par. 13).

■ The NYSA's refusal to admit ICTC to membership can hardly be justified on the ground that this would violate the General Cargo Agreement with the ILA. On the contrary, the ILA states that as long as ICTC is not a member of the NYSA "members of ILA employed by plaintiff would lose their seniority under the collective bargaining agreement between ILA and NYSA and their right to a guaranteed annual wage based on 2080 hours" (Gleason Aff., Par. 5); that "the ILA gave up its right to stuff and strip every container and in its stead received a guaranteed annual wage for longshoremen based on 2080 hours in the Port of New York" (id., Par. 16); and that "If ILA were to contract with a party other than NYSA,

it would be unable to protect the employees' rights to a guaranteed annual wage or their seniority rights under the agreement with NYSA" (id., Par. 18). Thus, as the Regional Director for the NLRB stated in a letter dated September 24, 1969, to plaintiff's counsel, the containerization clause in the General Cargo Agreement "has, as its object, the preservation of work performed by longshoremen who are employed by the New York Shipping Association and represented by the International Longshoremen's Association."

■ There appears to be no evidence to support the assertions of the ILA and the NYSA that the exclusion of ICTC is nothing more than an implementation of work preservation rules for the direct and immediate benefit of the ILA rather than a method of restraining ICTC's competition. For present purposes we do not question the fact that Rule 2, which requires stripping and stuffing by ILA labor at General Cargo Agreement rates, is a work preservation measure. But it is undisputed that at all times ICTC has been willing to preserve all of its work for ILA labor employed according to the terms and conditions of the General Cargo Agreement. Furthermore, plaintiff's facility where the work is to be performed is located within two blocks of the waterfront on a marine terminal complex and thus is on a "waterfront terminal" according to the definition of that term found in the Waterfront Commission Act as a location "within one thousand yards of any pier in the Port of New York district and which is used for waterborne freight in whole or in substantial part" 32 N.J.S.A. 23–6; ch. 202, part I, § 1, art. II [1953] N.J. Acts 1513. Thus no reason appears why plaintiff's premises should not qualify as a "waterfront fa-

---

1. Since the principal objection of the ILA to negotiating a collective agreement with ICTC is that ICTC is not a member of the NYSA, it would be circular to deny ICTC membership in the NYSA solely because it has no collective agreement.

This is particularly true when ICTC is not only eager to negotiate such an agreement but stands ready to provide all Master Contract benefits to its employees even without an agreement.

cility" as that term is used in the General Cargo Agreement.

█ Thus the conduct of the NYSA in refusing membership to ICTC and that of the NYSA–ILA Container Committee in imposing heavy fines upon shippers handling containers stuffed and stripped by plaintiff with ILA labor, unless satisfactorily explained, appears to provide the basis for an inference that it has been part and parcel of an NYSA–ILA combination and conspiracy to exclude ICTC from effectively competing with members of the NYSA in the performance of their operations rather than merely a work preservation measure. If so, it would violate the Sherman Act. Allen Bradley Co. v. Local Union No. 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); Jewel Tea Co. v. Local Unions Nos. 189, 262, etc., Amalgamated Meat Cutters, etc., 274 F.2d 217 (7th Cir.), cert. denied, 362 U.S. 936, 80 S.Ct. 757, 4 L.Ed.2d 747 (1960); Anderson-Friberg, Inc. v. Justin R. Clary & Son, 98 F.Supp. 75 (S.D. N.Y.1951).

"* * * Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to create business monopolies and to control the marketing of goods and services.

* * * * * *

"But when the unions participated with a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation was created not included with the exemptions of the Clayton and Norris-LaGuardia Acts.

"It must be remembered that the exemptions granted the unions were special exceptions to a general legislative plan. The primary objective of all the Anti-trust legislation has been to preserve business competition and to proscribe business monopoly. It would be a surprising thing if Congress, in order to prevent a misapplication of that legislation to labor un-

ions, had bestowed upon such unions complete and unreviewable authority to aid business groups to frustrate its primary objective." (325 U.S. at 808, 809–810, 65 S.Ct. at 1539–1540)

In the absence of any showing of a lawful union purpose to be served, the conduct of the NYSA and the ILA may reasonably be interpreted as being directed toward the impermissible objective of aiding NYSA members "to control the marketing of goods and services," Allen Bradley, supra at 808, 65 S.Ct. at 1539. In the absence of some valid basis for their conduct, therefore—and none has so far been provided by defendants— plaintiff has made a sufficient showing on the merits to warrant the issuance of preliminary relief.

█ Turning to the issue of balance of injury and hardship, the proof is clear that unless preliminary relief is granted, plaintiff will be out of business, whereas there is no indication that the issuance of such relief would cause any appreciable harm to the defendants. The ILA would not be hurt, since its members would be employed by plaintiff at General Cargo Agreement rates. NYSA members would be harmed only to the extent that plaintiff would provide additional competition in the furnishing of stevedoring services, which is the very objective of the Sherman Act.

█ Defendants' argument that the effect of preliminary injunctive relief would be to obtain preferential treatment for ICTC rather than to preserve the status quo, see Warner Bros. Pictures, Inc. v. Gittone, supra, 110 F.2d at 293, must also be rejected. Prior to the commencement in late August or early September of the NYSA–ILA Container Committee's imposition of heavy fines upon shippers loading and unloading containers stuffed and stripped by ICTC, the latter was able through employment of ILA labor to engage in competition with NYSA members. This competition has apparently been frustrated through the defendants' conduct. The effect of preliminary relief, there-

fore, would be to restore the parties to the competitive position that existed prior to the alleged unlawful conduct rather than to give plaintiff a preferential status. The situation here is sharply distinguishable from that before the court in *Anderson-Friberg, Inc., supra*, where preliminary relief was denied on condition that the case be tried immediately. There there were sharp issues of fact. The unions adduced substantial evidence at the outset to the effect that the agreements complained of not only were intended to but did result in higher wages and better hours and working conditions for their members, whereas the granting of relief would have permitted the plaintiffs to use the products of cheaper labor imported from Vermont. No such situation exists here.

In opposition to plaintiff's application for injunctive relief and in support of their motions for dismissal and for summary judgment, defendants next argue that this court lacks jurisdiction over the subject matter of plaintiff's claim because jurisdiction has been preempted by the NLRB; that the injunctive relief sought is barred by the Norris-LaGuardia Act; that Judge Murphy's dismissal of plaintiff's earlier action for similar relief is *res judicata*; and that defendants are entitled to summary judgment on the merits of the alleged Sherman Act violations.

█ Defendants argue first that since the issues before this court are essentially the same as those raised by plaintiff in its unfair labor practice charges before the NLRB, this court is without jurisdiction over the subject matter of the action. San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), is cited for the proposition that when the activities forming the basis of claims before a state or federal court are arguably protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, the court must yield jurisdiction of the dispute to the Board. *Garmon* is, however, inapplicable here. We are faced

not with potential conflict between state regulation and national labor policy, but with the intersecting provisions of two federal statutes. That certain activities may arguably constitute an unfair labor practice under § 8(e) does not oust a federal court of jurisdiction over a Sherman Act claim arising out of the same activities as part of a combination with employers to restrain competition against the latter, and this is true whether or not the Sherman Act plaintiff has invoked the jurisdiction of the Board over his unfair labor practice claims. Allen Bradley Co. v. Local Union No. 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945).

█ Defendants' contention that the Norris-LaGuardia Act bars the injunctive relief sought in this case must also be rejected, since it ignores the plain holdings of *Allen Bradley* and its progeny. See, e. g., Anderson-Friberg, Inc. v. Justin R. Clary & Son, 98 F.Supp. 75, 82 (S.D.N.Y.1951 (Weinfeld, J.)).

█ *Res judicata* would bar plaintiff's action only if the "cause of action" before us were essentially the same as that dismissed by Judge Murphy on November 25, 1969. Defendants insist that the complaint in that earlier suit stated a cause of action—the alleged refusal to handle plaintiff's containers—essentially identical to that before us, even though the Sherman Act was not mentioned therein, and urge generally that "If the same facts, the same witnesses and the same 'wrongs' are involved in the first action a subsequent cause of action structured on a somewhat different *theory* of action is just as effectively barred by *res judicata* as if the first and second theories of action were precisely the same." Even accepting defendants' test, however, we do not reach their result in applying it to the facts of the instant case.

The complaint in the action before Judge Murphy sought the intervention of a court of equity to prevent, by the issuance of an injunction, injury to plaintiff's business being caused by the

refusal of the NYSA and its members to handle containers stuffed and stripped by plaintiff, without payment by plaintiff of a $250 assessment on each container involved. The ILA was not joined as a party defendant, and there were no allegations of a Sherman Act conspiracy between the NYSA and the ILA to prevent plaintiff from competing with stevedore members of the NYSA. Plaintiff alleged rather that it was in full compliance with the Rules, and that the NYSA's determinations that it did not employ proper labor and did not operate a "waterfront facility" meeting the requirements of the Master Contract were arbitrary, capricious, self-serving and without basis in fact.

In this action, in contrast, the complaint expressly alleges violations of the Sherman Act and seeks a declaratory judgment, issuance of an injunction and treble damages thereunder to prevent and redress damage caused to plaintiff's business by the alleged agreement between the NYSA and the ILA to restrain competition in the stuffing and stripping of containers in the Port of New York. Here the ILA, as one of the two collective conspiring parties, is joined as a party defendant. While many of the acts alleged to be a furtherance of the conspiracy to restrain competition are identical to the refusal-to-handle allegations of the earlier complaint, it is not possible to say that "the same facts, the same witnesses and the same 'wrongs'" are involved in the two actions. It is also apparent that Judge Murphy did not believe that the earlier complaints stated an *Allen Bradley* type of Sherman Act claim, which would be cognizable by this court without regard to previous invocation of Labor Board relief. In dismissing the complaint in a short memorandum opinion, he did not advert to any such contention, but simply stated:

"The principal difficulty on this motion arises from reading the conflicting affidavits. Counsel for each party paraphrases the complaint as if it were two different documents.

Having read the complaint, we agree with defendants' analysis and hold that since the plaintiff has invoked the jurisdiction of the National Labor Relations Board, that Board has preempted this court's jurisdiction over the subject matter."

Although ICTC's attorney then addressed a letter to Judge Murphy referring for the first time to the antitrust laws and *Allen Bradley*, by that time Judge Murphy's order had been signed and filed. We can only conclude from his brief remarks with respect to the conflicting construction attached by the parties to the earlier complaints that he did not intend to foreclose the plaintiff from filing a new action clearly stating an *Allen Bradley* claim, which we now have before us. Even if there is some overlap between the claims stated in the two complaints, such overlap is not the same thing as identity. The doctrine of *res judicata* does prevent a plaintiff from taking two bites out of the same apple, but it does not necessarily prevent him from making two claims against the same defendant. Here there is enough difference between the two causes of action in question to preclude dismissal of the complaint before us on *res judicata* grounds.

In view of our determination upon the record before us that plaintiff is entitled to preliminary relief, defendants' contention that they are entitled to dismissal of the complaint and summary judgment on the merits of the controversy must be rejected. Pending final determination of the action, defendants should be restrained from directly or indirectly taking any action (including adoption or interpretation of rules, or imposition of fines or other penalties) which induces or is intended to induce others to refrain from using plaintiff's services in stuffing or stripping containers or from handling containers stuffed or stripped by plaintiff, and should be directed to withdraw any directives previously issued which had, or were intended to have, those effects.

The foregoing will constitute the findings of fact and conclusions of law under Rule 52(a), F.R.Civ.P.

Settle order in accordance with Rule 65, F.R.Civ.P.

## ON MOTION FOR REARGUMENT

On March 23, 1970, we granted plaintiff's request for a preliminary injunction in this Sherman Act suit involving the business of stuffing and stripping cargo containers in the Port of New York. We concluded that plaintiff had made a *prima facie* showing of a Sherman Act conspiracy between defendants to restrain plaintiff from competing with members of defendant NYSA engaged in certain activities related to pier or ship operations requiring employment of longshore labor, i. e., stuffing of containers for loading as cargoes, and stripping of such containers. Allen Bradley Co. v. Local Union No. 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945).

Defendant NYSA, urging that our opinion is legally and factually deficient in a number of respects, has now moved for reargument and reconsideration of the decision, seconded by an affidavit submitted by Thomas W. Gleason, President of defendant ILA. The NYSA also seeks a stay of all proceedings in this action pending the determination of this motion or, in the alternative, a stay pending appeal of enforcement of any preliminary injunction entered pursuant to the March 23 opinion. Only the second alternative is now before us, a preliminary injunction having been entered on April 6. The motion for reargument is granted, and upon full reconsideration we adhere to our original decision and deny the request for a stay for the reasons stated below.

Defendant NYSA presents three arguments for reconsideration: first, that the entire action is barred by the doctrine of collateral estoppel; second, that

injunctive relief has been rendered meaningless by plaintiff's abandonment of its business on March 13; and third, that our opinion contains certain material factual errors and incorrect assumptions.

Before discussing these objections, two general criticisms levelled by the defendant NYSA may be briefly disposed of. It is claimed first (Giardino Aff. pp. 2–3) that we

> "failed to perceive the underlying purpose for the containerization rules which was to preserve the legitimate right of employers and defendant union to protect the job opportunities of the employees so that work traditionally performed for decades at the waterfront piers and terminals would continue to be there performed, even if, for some containers, it was a 'make work' function or activity."

We refer defendant NYSA to page 569 of our opinion:

> "For present purposes we do not question the fact that Rule 2, which requires stripping and stuffing by ILA labor at General Cargo Agreement rates, is a work preservation measure."

We also suggest perusal of the Gleason affidavit submitted in support of defendant NYSA's present motion for reconsideration, which states at page 4:

> "As the NLRB has found, and as this Court seems to have agreed, (P. 569 of Opinion) Rule 2 of the Rules on Containers * * * is purely and simply a work preservation measure."

It is true that we found that the Rules on Containers, as enforced by the defendants in the context of their restrictive membership requirements, might constitute one element of a scheme to restrain competition. It is not true, however, that we therefore failed to appreciate defendant's contention that the

Rules themselves are fundamentally work preservation measures.

■ Defendant NYSA also claims that we "failed to perceive the sensitive labor relations balance that exists between employers and unions in this industry," (Giardino Aff. p. 2) and hints darkly that our opinion "presages labor strife and strikes" in the Port of New York. The affidavits submitted on the original motion, which we summarized by the reference at page 565 of our opinion to "A decade of intermittent labor warfare in the Port of New York," made the labor problems of this industry quite clear. In the absence of anything more concrete than picturesque verbiage, we doubt that the granting of an injunction in this case will "upset the delicate balance" of the "intricate mosaic" of labor relations in the Port of New York. In any event the threat of labor strife would not justify our condoning a violation of the Sherman Act.

### The "Bar" of Collateral Estoppel

Correctly observing that "The original decision contains not a word about collateral estoppel," defendant NYSA urges that while *res judicata* may not bar this suit because of distinctions between the cause of action herein stated and that previously dismissed by Judge Murphy, nevertheless the doctrine of collateral estoppel prevents plaintiff from relitigating the question of subject matter jurisdiction. The argument seems to be that since there are certain "fact allegations" common to both suits Judge Murphy's holding that this court lacked subject matter jurisdiction in the first case bars us from exercising jurisdiction over any subsequent suit between the same parties based on the same factual allegations.

■ Preliminarily we note that while the issue of *res judicata* was extensively briefed and argued, collateral estoppel was never mentioned in connection with the original motion. Now that the point has been raised, moreover, we think that it is inapplicable and adds nothing apparently because of defendant's misconception of the doctrine itself. Subject matter jurisdiction relates to causes of action, not to groups of facts *qua* facts. Judge Murphy made no findings of fact and no determination as to whether a Sherman Act claim was stated. He did not find that this court lacked jurisdiction over certain *facts*. He merely concluded that its jurisdiction had been pre-empted as to a certain type of claim or *cause of action*. Our determination that the present complaint states a cause of action distinct from that upon which Judge Murphy passed —or, as we put it, that "it is not possible to say that 'the same facts, the same witnesses and the same "wrongs" ' are involved in the two actions"—is dispositive of the jurisdictional issue in this case. Operative "facts" cannot be separated out from Judge Murphy's finding of lack of jurisdiction in the same way that litigated "issues" can be separated out from the ultimate judgment in the normal collateral estoppel situation. Only *one* issue was involved in the prior case—the court's subject matter jurisdiction over the cause of action there stated. Given our finding that a different cause of action is in issue before us, Judge Murphy's holding is no bar here, no matter which rubric—*res judicata* or collateral estoppel—is invoked.

### Plaintiff's Alleged Abandonment of its Business

Alfred Giardino, in his affidavit in support of defendant NYSA's motion for reargument, states as follows (p. 3):

"8. I am advised that plaintiff is not now engaged in any business operations whatever in the Port of New York and that plaintiff actually abandoned the premises on March 13, 1970 and was formally dispossessed therefrom on March 16, 1970.

"9. These facts were not known to us and presumably not to this Court

at the time it made its original decision.

"10. Under these conditions, any injunctive relief to be granted to plaintiff would be meaningless, fruitless and inappropriate * * *."

■ Plaintiff advised this court, by letter of March 30, 1970, that it had been forced to vacate its premises at Port Newark because of financial conditions. It appears from the affidavit of Mr. Anthony G. Guiliano, plaintiff's President, however, that while its operations have been "seriously crippled because of defendants' actions in stopping all of its stuffing and stripping activities", ICTC has relocated at 839 River Road, Edgewater, New Jersey, where it occupies about 30,000 square feet of space *directly on the waterfront* pursuant to a written lease. Plaintiff's stuffing and stripping operations have been dealt a serious blow, but it is still in business, apparently prepared to recommence its container operations as soon as its legal right to do so, free of Container Committee fines imposed upon shippers dealing with it, is established. Thus the motion cannot be dismissed as moot, a result that would, according to ICTC, reward the defendants for their alleged unlawful conduct.

### Alleged Factual Errors and Incorrect Assumptions

The NYSA takes issue with several aspects of our understanding of the factual background of this case, stating that a "detailed reading of the record" demonstrates our errors. Without meaning to excuse any errors of which we may have been guilty, we think it is only fair to point out that the record in this case was notably deficient in precisely the sort of background information of which defendant speaks, and that painstaking reading and rereading of the documents and papers submitted was required to piece together any intelligible picture of many aspects of defendants' operations. We refrained from holding further hearings only because the case called for speedy decision and because enough information could be gleaned from the record to permit a determination of the sort required on a motion for preliminary injunctive relief.

In any event, upon reconsideration we fail to find any legally significant misconceptions in our original opinion or any new disclosures that would require us to change it. Plaintiff's operations fall squarely within the plain language of NYSA's definition of "Associate Member," i. e., "activities related to pier or ship operations and employing waterfront employees." Its employees are engaged in the type of longshore work covered by the General Cargo Agreement and by the definition of the ILA bargaining unit presently engaged in stuffing and stripping on the piers, i. e., "work pertaining to * * * the loading and unloading of cargos." Furthermore, plaintiff is prepared to hire longshore labor to do this work at its new location "directly on the waterfront pursuant to written lease", which eliminates defendants' earlier contention that because it was located two blocks off the waterfront it was disqualified for failure to conduct its "activities at deepsea piers and terminals."

The fact that the ILA may also issue charters to locals engaged in other activities or at different locations (e. g., warehouse, factory or industrial employees) is immaterial. Plaintiff's employees are engaged in longshore operations and plaintiff is prepared to continue employing longshore labor to conduct stuffing and stripping operations admittedly being performed now by the ILA which states under oath that "longshoremen represented by the ILA have been stuffing and stripping containers for many years" (Gleason Aff. Jan. 24, 1970, ¶ 13).

Accordingly we adhere to our decision dated March 23, 1970.

It is so ordered.