**SERVOMATION MATHIAS, INC.,**
**Plaintiff,**

v.

**Leonard L. ENGLERT, Defendant.**

**Civ. A. No. 71–357.**

United States District Court,
M. D. Pennsylvania.

Nov. 3, 1971.

Allen E. Ertel, Williamsport, Pa., for plaintiff.

Peter Matson, Lewisburg, Pa., for defendant.

OPINION

MUIR, District Judge.

This matter is before the Court on the application of Servomation Mathias, Inc. for a preliminary injunction against its former employee, Leonard L. Englert, restraining him from violating a provision of his employment contract in the nature of a covenant not to compete. Plaintiff initially sought a temporary restraining order enjoining Englert from revealing trade secrets and from performing services as dining hall manager at Mansfield State College, Mansfield, Pennsylvania for Mark Four Management Services, Inc., a corporation which, like plaintiff, is in the business of providing food service for institutions. On August 20, 1971, we refused to grant a temporary restraining order because plaintiff failed to satisfy us of the likelihood it would prevail on the merits and because it did not appear that plaintiff's injury was either immediate or irreparable as required by F.R. Civ.P. 65(b). After a hearing on the preliminary injunction on September 2, 1971, and argument, and upon careful consideration of the briefs of both parties, the preliminary injunction is denied.

Jurisdiction is predicated upon 28 U. S.C. § 1332(a). Plaintiff is a Maryland corporation with its principal place of business located at Towson, Maryland, and defendant Leonard L. Englert is a citizen of Pennsylvania who resides in Mansfield, Tioga County, Pennsylvania. We find from the testimony on the preliminary injunction that the amount in controversy, exclusive of interest and costs, exceeds $10,000.

On March 5, 1969, Leonard L. Englert entered into a written employment contract [1] with Servomation Mathias,

---

1.             Date March 5, 1969
In consideration of my employment by Servomation Mathias Inc. in the capacity of Manager, at a salary of at least One Hundred and Seventy Five Dollars ($175.00/xx) a week, effective 3/5/69, I hereby agree that I will not, for a period of one year after termination of my employment for any reason whatever, on my own behalf or on behalf of any other person, firm or corporation, carry on or be engaged in or in anyway be concerned with the operation of or solicit the business of any cafeteria or food facility operated, serving or sponsored for

Inc. under the terms of which he agreed to work for Servomation as a manager for $175.00 per week. Thereafter, Englert was employed by Servomation as a manager assigned to its operation at Marymount College, Boca Raton, Florida, until May 15, 1971, when he resigned.

For a period of approximately eleven years prior to May, 1971, Mansfield State College was a client of Servomation Mathias Pa., Inc.[2] In April, 1971, Mansfield State College notified Servomation Mathias Pa., Inc. of its intention to terminate the contract and to accept bids on a new contract. Servomation Mathias Pa., Inc. submitted a bid on the new contract, but on June 1, 1971, the contract was awarded to a competitor, Mark Four Management Services, Inc., several of whose officers and employees are former officers and employees of Servomation Mathias, Inc. and its subsidiaries. After resigning from Servomation Mathias, Inc., Englert accepted employment with Mark Four and was assigned to Mark Four's operation at the dining hall at Mansfield State College.

On August 20, 1971, Servomation Mathias, Inc. instituted this action, predicating its right to injunctive relief[3] on the following provisions of Englert's employment contract:

"In consideration of my employment by Servomation Mathias, Inc. in the capacity of Manager, at a salary of at least ONE HUNDRED AND SEVENTY FIVE Dollars ($175.00/xx) a week, effective 3/5/69, I hereby agree that I will not, for a period of one year after termination of my employment for any reason whatever, on my own behalf or on behalf of any other person, firm or corporation, carry on or be engaged in or in any way be concerned with the operation of or solicit the business of any cafeteria or food facility operated, serving or sponsored for its employees, guests, students, campers or patients by any person, firm or corporation who shall have been your client within the period of One (1) year prior to the termination of my employment or with whom you may have been negotiating during my employment by you if I

its employees, guests, students, campers or patients by any person, firm or corporation who shall have been your client within the period of One (1) year prior to the termination of my employment or with whom you may have been negotiating during my employment by you if I have participated in such negotiations, directly or indirectly, or have had contact with them, directly or indirectly, in the course of my employment with you.

I will not, during or after the term of my employment, divulge to others, or make use of any information or knowledge relating to your business, methods, processes, techniques, products, or research, which shall not be generally known to the public or recognized as standard practice.

I will not, during the term of my employment, become associated with or set-up, operate or manage any other business directly or indirectly connected with the food service industry.

Your acceptance of this Agreement, constitutes an agreement to employ me as aforesaid for at least four (4) weeks and not to dismiss me at any time thereafter

without at least two (2) weeks notice, or two (2) weeks severance pay in lieu thereof, except for disregard of duty, gross incompetence, fraud or dishonesty. This Agreement shall be construed and applied in accordance with the laws of the State of Maryland.

/s/ Leonard Englert
Employee's Signature
Leonard Englert #11
Accepted by /s/ J. W. Mayer
Title         R. G. M.

2. The court was advised during oral argument that Servomation Mathias Pa., Inc. is a wholly-owned Pennsylvania subsidiary of Servomation Mathias, Inc., the parent corporation being incorporated in Maryland.

3. Plaintiff's complaint requests, *inter alia*: "1. Defendant be enjoined and restrained from rendering or causing to be rendered any services by him, directly or indirectly, at the State College, Mansfield, Pennsylvania, for a period of one year from the date of termination of his employment contract with Plaintiff."

have participated in such negotiations, directly or indirectly, or have had contact with them, directly or indirectly, in the course of my employment with you."

Plaintiff contends this covenant prohibits Englert from working at the dining facilities of Mansfield State College because the College was a client of Servomation Mathias during the year prior to Englert's resignation on May 15, 1971; in so doing, plaintiff ignores the final qualifying clause of the covenant which is fatal to that legal theory:

"* * * if I have participated in such negotiations, directly or indirectly, or have had contact with them, directly or indirectly, in the course of my employment with you."

The most plaintiff can contend is that the final qualifying clause quoted above is ambiguous in its modification. Thus, the last part of the covenant, which defines the scope of the restrictions, can be analyzed into the following four components:

"I will not * * * carry on or be engaged in * * * the operation of * * * any cafeteria or food facility operated, serving or sponsored for its employees, guests, students, campers or patients by any person, firm or corporation

(a) who shall have been your client within the period of One (1) year prior to the termination of my employment

or

(b) with whom you may have been negotiating during my employment by you

if I

(c) have participated in such negotiations, directly or indirectly,

or

(d) have had contact with them, directly or indirectly, in the course of my employment with you."

Since Englert neither participated in Servomation Mathias-Mansfield negotiations nor had contact with Mansfield State College during the course of his employment, plaintiff's contention that the covenant applies would be correct only if neither clause (c) nor clause (d) qualifies clause (a). If clauses (c) and (d) do not qualify clause (a), they qualify clause (b) or nothing. Giving significance to both clauses, on plaintiff's theory, requires they be interpreted as qualifying clause (b). But the meaning of clause (d) includes within it the meaning of clause (c), since "participating in negotiations with X" is a specific instance of the more general concept of "having contact with X." On plaintiff's theory, then, clause (c) is redundant. It is hornbook law that in interpreting a written contract, all parts or sections of the writing and every sentence, clause, provision, phrase, and word in it should be given effect and meaning if possible without violating the plain language of the instrument and the clear purpose of the contracting parties. A construction rendering a provision, term or part meaningless or superfluous should be avoided.[4]

In my opinion, the more reasonable interpretation of this artlessly drawn covenant is as follows:

(1) clause (c) qualifies clause (b), and

(2) clause (d) qualifies clause (a).

In other words, Englert would be prohibited from working at Mansfield State College if and only if he either had contact, direct or indirect, with Mansfield State College, or participated in negotiations with Mansfield in the course of his employment with Servomation Mathias. Since there is no evidence in this record of either, Englert is not in violation of the covenant.

4. Williston on Contracts, Third Edition, § 620; Restatement, Contracts, § 236(a). For a collection of controlling Maryland cases, see 17A C.J.S. Contracts § 297, n. 86.

■ At this stage, it is unnecessary to hold that plaintiff's interpretation of the covenant is wholly without merit. It is sufficient to observe that plaintiff has not demonstrated the likelihood it will prevail on the merits. With the asserted legal rights of the plaintiff to ultimate relief put in substantial issue, no preliminary injunction should be granted. Nelson v. Miller, 373 F.2d 474, 477 (3d Cir. 1967); Winkleman v. New York Stock Exchange, 445 F.2d 786 (3d Cir. 1971); 7 J. Moore, Federal Practice ¶65.04[1], n. 14, at 1629–1630 (2d Ed. 1970) and cases cited therein. As Judge Weinfeld stated in Anderson-Friberg, Inc. v. Justin R. Clary & Son, 98 F. Supp. 75, 82 (S.D.N.Y., 1951): "The law is well settled that the extraordinary relief of a preliminary injunction, which in advance of trial in effect gives a party the full relief to which he might be entitled after a full trial, will not issue under such circumstances."

On the other hand, if plaintiff's interpretation of the covenant were correct, its enforcibility would be in grave doubt. This consideration reinforces our conclusion that no preliminary injunction should issue.

■ The employment contract provides that it "shall be construed and applied in accordance with the laws of the State of Maryland." Like many jurisdictions, Maryland has adopted what is essentially the Restatement of Contracts[5] test of the validity of post-employment restraints ancillary to employment contracts. Silver v. Goldberger, 231 Md. 1, 6, 188 A.2d 155 (1962); Tawney v. Mutual System of Maryland, 186 Md. 508, 47 A.2d 372 (1945). A covenant restraining an employee from competing with his former employer on termination of employment is valid if it is reasonable in view of the circumstances of the particular case. Ruhl v. Bartlett Tree Co., 245 Md. 118, 124, 225 A.2d 288 (1966); Tawney v. Mutual System of Maryland, *supra*.

■ The general rule is that restrictive covenants in a contract of employment will be enforced "if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public." Silver v. Goldberger, *supra*, at 6, 188 A.2d at 158; Ruhl v. Bartlett Tree Co., *supra*, at 124, 225 A.2d 288. Under Maryland law, protectible employer interests include customer relationships and confidential business information.[6] Assuming *arguendo*, plaintiff's interpretation of the covenant, Englert is prohibited from working at the food service installations of former clients of Servomation Mathias, Inc. with whom he had no contact during the course of his employment. Obviously, the covenant so construed goes far beyond what is reasonably necessary to protect plaintiff's customer relationships.[7] What is reasonable in the way of a post-employment restriction to pre-

---

5. Restatement, Contracts §§ 513–515 (1932). See H. Blake, "Employee Agreements *Not to Compete*," 73 Harv.L.Rev. 625, 648–649 (1960), cited in Ruhl v. F. A. Bartlett Tree Expert Co., 245 Md. 118, 124, 225 A.2d 288 (1966).

6. See, Ruhl v. Bartlett Tree Co., supra, and Space Aero Products Co. v. R. E. Darling Co., 238 Md. 93, 208 A.2d 74 (1965).

7. However, if clause (d) is read as qualifying clause (a), the sense and purpose of the covenant is clear; viz, to decrease the risk of loss of clientele to an employee or to an employee's new employer because of good will attributable to the nature of the employee's performance and personal dealings with clients. As stated above, when so construed, Englert is not in violation of the covenant.

8. See the analysis in Blake, supra, n. 4, at 651, et seq.

serve customer relationships depends, in part, upon the magnitude of the risk of loss of clientele, which, in turn, depends upon the frequency and locale of the employee's contacts with customers, and the nature of the functions performed by the employee.[8] Infrequent and irregular contacts between an employee and his employer's clients may not pose a risk substantial enough to justify a restraint. Where, as here, an ex-employee is restrained—on plaintiff's interpretation of the contract—from serving a former client of his ex-employer with whom he had *no contact* during the term of his employment, the reasonableness of the restraint as a device for protection of customer relationships is highly questionable.

■ The determination of the reasonableness of a restrictive covenant which is designed to minimize the risk of dissemination to competitors of confidential business information such as trade secrets depends primarily upon consideration of two factors: (1) the nature of the information, including how it came into being, e. g., by employer's research through a considerable investment of time, effort or money, and whether it is, in fact, not common knowledge in the industry, and (2) the efforts of the employer to keep it confidential. Englert started as a chef for A. L. Mathias Corp.[9] in 1964, was promoted to the position of Assistant Manager in June, 1965, and to the position of Manager in March, 1966. When he was promoted to the position of Manager, he was given certain company manuals, which he returned to the company when he resigned in May, 1971. It was not until 1969, three years after he received the manuals, that Englert was required to sign the contract containing the covenant and the provision relating to disclosure of confidential information.[10] An official of the company admitted that there were instances where employees of the company who had access to the manuals and all the fruits of the company's research program were never required to sign such covenants and that several of these former employees of Servomation are now employees or officers of Mark Four, Englert's present employer. The manuals Englert received in 1966 contain recipes devised in the research kitchens of Servomation Mathias by Carl A. Richter, Vice President in Charge of Food Standards and Research. Mr. Richter, a member of the Academy of Chefs and recipient of its highest awards, is charged with the responsibility of developing recipes which maintain a high standard of culinary excellence and, at the same time, utilize the latest advances in food technology, to minimize cost, preparation time and complexity. Although the recipes are not common knowledge, it appears from the record before us that the company's efforts to preserve their confidentiality have been somewhat less than vigorous and that the information is known to employees and officers of at least one of Servomation's competitors.

■ Maryland law is clear that absolute secrecy is not a necessary condition of the right of the owner of a trade secret to obtain judicial protection, but a substantial element of secrecy must exist. Space Aero Products Co. v. R. E. Darling Co., 238 Md. 93, 110–111, 208 A.2d 74 (1965); Mycalex Corporation of America v. Pemco Corporation, 64 F. Supp. 420, 423 (D.C.Md.1946); see also, Excelsior Steel Furnace Co. v. Williamson Heater Co., 269 F. 614, 616 (6th Cir. 1920), cited approvingly in *Space Aero*,

---

9. A precursor of Servomation Mathias, Inc.

10. " * * * I will not, during or after the term of my employment, divulge to others, or make use of any information or knowledge relating to your business, methods, processes, techniques, products, or research, which shall not be generally known to the public or recognized as standard practice."

*supra.* In the *Space Aero* case, the Maryland court was guided in its determination whether certain alleged trade secrets deserved judicial protection by factors set forth in Restatement, Torts, § 757b: "(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." The lapses in Servomation's security program to preserve the confidentiality of its alleged trade secrets and the fact that the information is already known by officers and employees of Englert's present employer who are not bound by similar covenants create substantial doubt at this stage that plaintiff will ultimately prevail on the merits, even upon the assumption, questioned above, that the covenant prohibits Englert from working at Mansfield State College.

A third defect in plaintiff's legal theory raised by counsel for defendant is this: Mansfield State College was a client of Servomation Mathias, Pa., Inc., a Pennsylvania corporation which, although owned by Servomation Mathias, Inc. is legally distinct from it. Englert's contract was with Servomation Mathias, Inc., not Servomation Mathias Pa., Inc. Therefore, in working at the facility of Mansfield State College, Englert is not working for a client of Servomation Mathias, Inc., and therefore, is not in violation of the covenant.

For these reasons, we deny the preliminary injunction.

This Opinion shall constitute findings of fact and conclusions of law required by F.R.Civ.P. 52(a).