K–2 SKI COMPANY, a corporation,
Plaintiff-Appellant,

v.

HEAD SKI CO., INC., a Delaware corporation and William Crocker,
Defendants-Appellees.

K–2 SKI COMPANY, a corporation,
Plaintiff-Appellee,

v.

HEAD SKI CO., INC., a Delaware corporation and William Crocker,
Defendants-Appellants.

Nos. 72–2823 and 72–2497.

United States Court of Appeals,
Ninth Circuit.

Oct. 29, 1974.

Theodore J. Collins (argued), Perkins, Coie, Stone, Olsen & Williams, Seattle, Wash., for appellant and cross-appellee.

Don Paul Badgley (argued), Bogle Gates, Dobrin, Wakefield & Long, Seattle, Wash., for appellees and cross-appellants.

Before MERRILL and WALLACE, Circuit Judges, and SKOPIL,* District Judge.

## OPINION

WALLACE, Circuit Judge:

K–2 Ski Company (K–2), a Washington corporation with its principal place of business in Washington, brought this action based upon diversity jurisdiction against Head Ski Company (Head), a Delaware corporation with its principal place of business in Maryland, and William Crocker, a citizen of Maryland, seeking damages and injunctive relief. K–2 alleged that subsequent to his employment by K–2, Crocker began working for Head and disclosed trade secrets. The district court issued a preliminary injunction against Head and Crocker in April, 1970. That action was reversed by us in July 1972. In the interim, the

---

* Honorable Otto R. Skopil, Jr., United States District Judge, District of Oregon, sitting by designation.

district court had appointed a special master to hear this case. The master made detailed findings of fact and concluded that Head had unlawfully used K–2 trade secrets. Accordingly, the district court issued a permanent injunction barring Head from using one of the K–2 trade secrets for one year and another secret for two years.

Head appeals contending (1) that K–2 is barred from claiming trade secret protection because it failed to take reasonable precautions to maintain secrecy, (2) that the duration of the injunction was excessive, (3) that the district court erred in awarding attorney's fees to K–2 and (4) that the district court erred in taxing the special master's fees against Head. K–2 cross-appeals contending that the court erred (1) in not finding the entire K–2 ski to be a trade secret and (2) in not awarding damages to K–2. We reverse the award of attorney's fees, remand the injunction and damage issues and affirm the remainder of the case.

## I. THE FACTS

Head and K–2 are competing ski manufacturers. In the early 1960's, Head's metal-laminated skis dominated the quality ski market. By 1967, the new K–2 fiberglass skis had been marketed and the demand for the K–2 skis had grown significantly. Crocker was employed by K–2 from May, 1967, to February 13, 1970. Prior to Crocker's employment with K–2, he had no knowledge of the construction or production of skis nor had he had any background in engineering, manufacturing, shop practice or purchasing. Crocker had majored in political science in college and had been primarily involved in appliance and furniture retailing prior to joining K–2. By January 1, 1968, Crocker had advanced to the position of general super-

intendent of the K–2 manufacturing operations. In that position, he supervised all aspects of the production of skis, purchased all the materials and hired and fired employees. In July, 1969, Crocker's responsibilities were transferred to another employee and by the end of 1969, Crocker had become dissatisfied with his job at K–2 and contacted Head concerning employment. On January 26, 1970, after visiting the Head plant in Maryland, Crocker was offered a job at Head. Coupled with the offer of a base salary was a bonus which was contingent upon production of 5,000 skis with a wet-wrap process by the end of 1970. Crocker joined Head on February 16, 1970, but did not disclose to K–2 the name of his new employer. This action was filed on March 23, 1970.

## II. SECRECY

Head argues that K–2 cannot claim trade secret protection because K–2 failed to take reasonable precautions to maintain the secrecy of its method of manufacturing its skis. In this diversity action we must look to state law for the substantive law of trade secrets. Since there is no Washington law on the issue before us and Maryland law relies on the Restatement of Torts § 757, Servomation Mathias, Inc. v. Englert, 333 F.Supp. 9, 14 (M.D.Pa.1971); Space Aero Products Co. v. R. E. Darling Co., Inc., 238 Md. 93, 208 A.2d 74, cert. denied, 382 U.S. 843, 86 S.Ct. 77, 15 L.Ed. 2d 83 (1965), we agree with the district court that there is no choice of law problem and the general common law and section 757 of the Restatement of Torts should apply.

There are two common law doctrines on secrecy: (1) absolute secrecy and (2) relative secrecy. The better view, and the one we think both Washington and Maryland would espouse,[1] is

1. Maryland law, which adopts the relative secrecy view, provides that absolute secrecy is not necessary but a substantial element of secrecy must exist. Servomation Mathias, Inc. v. Englert, 333 F.Supp. 9, 14 (M.D.Pa. 1971); accord, Clark v. Bunker, 453 F.2d 1006, 1009 (9th Cir. 1972) (citing Restate-

ment of Torts § 757); E. I. duPont deNemours & Co., Inc. v. Christopher, 431 F. 2d 1012, 1015 (5th Cir. 1970), cert. denied, 400 U.S. 1024, 91 S.Ct. 581, 27 L.Ed.2d 637 (1971) (citing Texas law, based upon the Restatement, requiring reasonable precautions to maintain secrecy).

the majority view of relative secrecy which has been adopted by the Restatement of Torts § 757. 12 Business Organizations, Milgrim, Trade Secrets § 2.-07[2] at 2–48 (1974).[2] This view requires a substantial element of secrecy, Clark v. Bunker, 453 F.2d 1006, 1009 (9th Cir. 1972), and that reasonable measures under the circumstances be taken to protect the secret. 12 Business Organizations, Milgrim, Trade Secrets § 2.04, at 2–16 (1974). The necessary determination of "[w]hether such a degree of secrecy existed in a particular case is a question of fact[,]" Clark v. Bunker, *supra*, 453 F.2d at 1010, *accord*, Milgrim, *supra*, § 2.07, at 2–44, and the trier of fact must consider "the entirety of circumstances surrounding use" of the secret. Milgrim, *supra*, § 2.04, at 2–16. Thus, the clearly erroneous standard of review applies to this issue. Fed.R.Civ. P. 52(a).

■ Two particular instances which Head cites as examples of the lack of secrecy by K–2 merit brief attention. The Pellon Corporation, which supplied K–2 with a material which was vital to the production of K–2 skis, sought to exhibit K–2 skis in its display at a conference in Washington, D. C. Crocker agreed to send the skis. The conference was held the same month Crocker left K–2 to go to work for Head. K–2 sent a "competition" model ski which was intact and a "holiday" model which had been cut lengthwise. None of the Head personnel attended the conference and there is no evidence of attendance by any other ski manufacturer. The district court found

that this did not constitute a public disclosure and this finding is not clearly erroneous. *See* Clark v. Bunker, *supra*, 453 F.2d at 1009–1010.

Occasionally, limited tours of the K–2 plant were conducted but personnel from competitor ski manufacturers were not permitted to view the ski manufacturing operation. The district court found that during these tours it was impossible to discover the K–2 procedure. The district court also found that even though the security at the plant was not tight, this did not destroy secrecy because the plant was located in a remote area. None of these findings are clearly erroneous.

## III. THE INJUNCTION

■ The district court found that K–2 had established two trade secrets and that Head had unlawfully utilized them in its production of skis. Relying upon Winston Research Corp. v. Minnesota Mining & Manufacturing Co., 350 F.2d 134, 141–142 (9th Cir. 1965), and Plant Industries, Inc. v. Coleman, 287 F.Supp. 636, 645 (C.D.Cal.1968), the district court enjoined Head from using the base subassembly trade secret for two years and the surfacing veil secret for one year. We are satisfied that the appropriate duration for the injunction should be the period of time it would have taken Head, either by reverse engineering or by independent development, to develop its ski legitimately without use of the K–2 trade secrets.[3] The district court properly determined the period for injunctive relief but, in issuing

2. Milgrim states that the absolute secrecy doctrine, which he submits has appeared in cases only as dicta, is the minority and less sound view. 12 Business Organizations, Milgrim, Trade Secrets § 2.07 [2], at 2–46 (1974).

3. Head has argued that Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), and Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), enunciate a federal

policy that state unfair competition laws cannot protect unpatented ideas. That argument has been dispelled by the Court. Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974). In *Winston* we said that *Sears* "preclude[d] judicial recognition of a legally protectible interest in the secrecy of industrial information as such, as distinguished from an interest in the integrity of confidential employer-employee relationships." 350 F.2d at 138 (footnote omitted). We are not persuaded that *Kewanee Oil* affects the proper injunctive period as described in *Winston*.

its permanent injunctions, apparently did not take into account the period of time that Head had already been under the preliminary injunction.

 Head argues that since the preliminary injunction lasted for 27 months, the two- and one-year injunctions are barred because Head has already been enjoined beyond the appropriate period of time necessary to deprive it of the benefits of using the K–2 trade secrets. This issue was not raised before the trial judge. While the general rule prohibits an appellate court from considering issues not urged before the lower court, we have said:

This [restraint] is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial [forum] is . . . to decide [and] in order that the litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence. Hormel v. Helvering, 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L. Ed. 1037.

There is, however, no rigid and undeviating judicially declared practice under which courts of review invariably and under all circumstances decline to consider all questions which have not previously been specifically urged. Indeed there could not be without doing violence to the statutes which give federal appellate courts the power to modify, reverse or remand decisions "as may be just under the circumstances." 28 U.S.C.A. § 2106. Exceptional cases or particular circumstances may prompt a reviewing court, where justice might otherwise result or where public policy requires, to consider questions neither pressed nor passed upon below. The power to raise and decide questions sua sponte is, however, to be exercised sparingly and with full realization of the restrictions and limitations inherent in its employment.

Nuelsen v. Sorensen, 293 F.2d 454, 462 (9th Cir. 1961) (footnote omitted). Because the record does not contain any transcript of proceedings before the special master, we do not know whether Head argued there that the permanent injunctions should not issue because the preliminary injunction had already been in effect for over two years. The record does reflect that the trial judge read the master's report.

In *Nuelsen,* we stated:

Rather than consider the matter sua sponte, of course, the appellate court may note the existence of the unargued, undecided question and remand the case to the lower court. This makes the decision on the matter one reflecting the consideration of a trial court and the counsel in the case.

293 F.2d at 462 (footnote omitted). We remand this issue to the trial court to consider the effect of the twenty-seven-month preliminary injunction on the one- and two-year permanent injunctions. In its determination, the trial court should consider whether the preliminary injunction served the same purpose as the permanent injunctions and whether it properly deprived Head of the benefits reaped by the use of the K–2 trade secrets. If the preliminary injunction had the same effect or accomplished the same result as the permanent injunctions would have, then the permanent injunctions may have been improper. On the other hand, if the preliminary injunction did not serve the same purpose and did not deprive Head of any benefits, then the permanent injunctions may have been the proper way to compensate K–2 for the unlawful use by Head of the K–2 trade secrets. This issue is more appropriate for a trial court determination because K–2 has argued that Head did not comply with the preliminary injunction and the trial judge is in a better position to resolve this conflict and the question of whether the preliminary injunction accomplished the same result as the permanent injunctions.

## IV. ATTORNEY'S FEES

The Supreme Court recently summarized the law of granting attorney's fees in federal court:

Although the traditional American rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual authorization, federal courts, in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require. Indeed, the power to award such fees "is part of the original authority of the chancellor to do equity in a particular situation," Sprague v. Ticonic National Bank, 307 U.S. 161, 166, [59 S.Ct. 777, 780, 83 L.Ed. 1184] (1939), and federal courts do not hesitate to exercise this inherent equitable power whenever "overriding considerations indicate the need for such a recovery." Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391–392, [90 S.Ct. 616, 625, 24 L.Ed.2d 593] (1970); see Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718, [87 S.Ct. 1404, 1407, 18 L.Ed.2d 475] (1967).

Thus, it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." 6 J. Moore, Federal Practice ¶ 54.-77[2], p. 1709 (2d ed. 1972); see, e. g., Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402 n. 4, [88 S. Ct. 964, 966, 19 L.Ed.2d 1263] (1968); Vaughan v. Atkinson, 369 U. S. 527, [82 S.Ct. 997, 8 L.Ed.2d 88] (1962); Bell v. School Bd. of Powhatan County, 321 F.2d 494 (CA4 1963); Rolax v. Atlantic Coast Line R. Co., 186 F.2d 473 (CA4 1951). In this class of cases, the underlying rationale of "fee-shifting" is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of "bad faith" on the part of the unsuccessful litigant.

Hall v. Cole, 412 U.S. 1, 4–5, 93 S.Ct. 1943, 1945, 36 L.Ed.2d 702 (1973) (footnotes omitted). In Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288, 298 (9th Cir. 1969), we said in a trade secret case that "[t]here is no general federal rule or policy favoring an award of attorney's fees to prevailing defendants in nonpatent cases."

■ The special master recommended that each party bear its own attorney's fees. The trial judge, however, decided to award K–2 $25,000 in attorney's fees. Although the trial judge disagreed with the special master on this issue, he did not make any findings of fact in relation to this award. The master, however, found that there was no wrongful inducement of Crocker by Head and that Head did not solicit the trade secrets from Crocker. Neither the district court's findings of fact nor the record reflects that in these instances Head acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." Accordingly, the award of attorney's fees must be reversed.

## V. COSTS OF THE SPECIAL MASTER

The order appointing the special master provided that each party would pay one-half of the fee and that the prevailing party could tax the entire expense as costs. Head argues that the court erred in assessing all of the costs of the master against Head.

■ The compensation of a master is fixed by the court and paid as the court may direct. Fed.R.Civ.P. 53(a). The prevailing party has a right to recover moneys paid for the master "as a part of its recoverable costs . . . ." 9 C. Wright & A. Miller, Federal Practice and Procedure § 2608, at 798 (1971); accord, 6 J. Moore, Federal Practice ¶ 54.77[3], at 1718 (2d ed. 1974). Federal Rule of Civil Procedure 54(d) provides that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs . . . ." Thus, the awarding of these costs is discretionary with the trial

judge, 9 C. Wright & A. Miller, Federal Practice and Procedure § 2608, at 795 (1971); C. Wright, Law of Federal Courts § 98, at 438 (2d ed. 1970); 6 J. Moore, Federal Practice ¶ 54.70[4], at 1310, ¶ 54.70[5], at 1312 (2d ed. 1974), and we will not overturn his decision unless it has been abused.

 Head contends that since K–2 prevailed on only two of its 12 alleged trade secrets and that since considerable expense of the master was spent in establishing the contentions of both parties, the cost should be divided by the parties.

> In general, a party in whose favor judgment is rendered by the district court is the prevailing party . . .·
> Although a plaintiff may not sustain his entire claim, if judgment is rendered for him he is the prevailing party.

6 J. Moore, Federal Practice ¶ 54.70[4], at 1306–1307 (2d ed. 1974) (footnotes omitted); *accord,* Hines v. Perez, 242 F. 2d 459, 466 (9th Cir. 1957).

K–2 was the prevailing party in this action and the district court did not abuse its discretion in allowing the master's compensation to be taxed as costs.

## VI. CROSS-APPEAL

### A. *Entire Ski as a Trade Secret*

In its cross-appeal, K–2 argues that the trial court erred in not finding that the entire process for making the K–2 ski is a trade secret. K–2 urges that Head be enjoined from producing this type of ski for the period of time it would have taken Head to have developed it independently without the use of the K–2 trade secrets. Citing Head Ski Co., Inc. v. Kam Ski Co., Inc., 158 F. Supp. 919 (D.Md.1958), and ILG Industries, Inc. v. Scott, 49 Ill.2d 88, 273 N. E.2d 393 (1971), K–2 argues that the injunction should cover the entire ski and not merely some of its component parts.

 The question of whether the entire process is a trade secret is a factual determination. Thus, K–2's argument would have been more appropriately directed to the trier of fact. On appeal we are limited to determining whether the findings of fact are clearly erroneous. Fed.R.Civ.P. 52(a). K–2 has not argued that the findings are clearly erroneous and, upon our review of the record, we conclude that they were not. The trial court did not err in failing to find that the entire process for making the K–2 ski was a trade secret.

### B. *Damages*

 K–2 contends that the trial court erred in not awarding damages for skis manufactured by Head using the K–2 trade secrets. Head has not responded to this argument. K–2 asked for both injunctive relief and damages in its complaint. Either or both forms of relief may be awarded in a trade secret case. 12 Business Organizations, Milgrim, Trade Secrets § 7.08[3] [a], at 7–71 (1974). K–2 asserts that the special master refused to let them go into this area during the trial and that this issue should be remanded for a determination of damages. We agree.

The trial judge heard arguments of counsel after the filing of the special master's report. K–2's counsel brought up the damages issue and the trial judge stated that he would decide that issue and write a memorandum on it. The record does not show that the trial judge did so nor did he mention the issue of damages in the findings of fact or conclusions of law. The trial judge's order merely adopted the master's findings and conclusions with one exception, *i. e.,* he ordered that Head pay the attorney's fees of K–2. Head's counsel had argued to the judge that damages or a reasonable royalty should be awarded instead of the injunction requiring Head to hold the skis off the market. Although the record shows that the trial judge said that he was "more or less" in agreement with this contention, the record does not show that this issue was ever decided. Head's counsel also stated that it was

understood by the parties, and the master had so instructed, that the damage issue would be reserved for a later determination and that was why the master made no findings on the value of the skis. The trial judge responded "we will work something out" and his last statement to counsel was that he might need some additional information to decide the question of damages. The record does not reflect that this issue was ever decided and we, therefore, remand this issue to the trial court to determine if damages are appropriate.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.