**BUFFETS, INC., a Minnesota corporation; and Evergreen Buffets, Inc., an Oregon corporation, Plaintiffs–Appellants,**

v.

**Paul KLINKE; Carol Klinke; Greg Klinke; Granny's Buffet, Inc., a Washington corporation; and Mark Miller, Defendants–Appellees.**

No. 94–36222.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 1995.

Decided Jan. 16, 1996.

D. Roger Reed, Michael J. Casey, Reed & Giesa, Spokane, Washington, for plaintiffs-appellants Buffets, Inc., and Evergreen Buffets, Inc.

William D. Symmes, Leslie R. Weatherhead, Timothy M. Lawlor, Witherspoon, Kelley, Davenport & Toole, Spokane, Washington, for defendants-appellees Paul Klinke, Carol Klinke, Greg Klinke, Granny's Buffet, Inc., and Mark Miller.

Before: D.W. NELSON and JOHN T. NOONAN, Jr., Circuit Judges, and TANNER, District Judge *

D.W. NELSON, Circuit Judge:

Appellant Buffets Inc., doing business as Old Country Buffets ("OCB"), brought this action against Appellee Paul Klinke, et al., ("The Klinkes"), for misappropriation of trade secrets and violation of Washington's Consumer Protection Act. OCB alleges that the Klinkes misappropriated its recipes and its job training manuals, both of which it claims are trade secrets, in order to open a buffet restaurant. The district court granted summary judgment for the Klinkes on the Consumer Protection Act claim and following a bench trial, entered judgment in favor of the Klinkes on the remaining claims. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Buffets Inc., a Minnesota corporation, operates a nationwide chain of budget buffet restaurants under the name Old Country Buffet. The restaurants serve food cafeteria-style on an "all-you-can-eat" basis for a fixed price. Dennis Scott, one of the principal founders of OCB, developed the first OCB menus and instituted the OCB practice of "small batch cooking": rather than preparing and storing large quantities of food at a time, which is standard practice in many buffet restaurants, Scott instead prepared small batches of food to insure freshness. Scott had a significant amount of experience in the restaurant business and adapted many of the recipes he acquired previously to this type of "small-batch" cooking. In 1989, Scott

* The Honorable Jack E. Tanner, Senior District Judge for the Western District of Washington, sitting by designation.

formed a new company, Evergreen Buffets, which opened its first OCB restaurant in Vancouver, Washington. Scott's partner, Joel Brown, hired Appellee Mark Miller to work at one of the Evergreen restaurants. Miller was fired in 1991, however, for alleged "financial improprieties."

In 1990, Scott met the Appellees Klinkes and gave them a tour of one of the OCB restaurants. The Klinkes were themselves successful restaurateurs, having operated a number of franchise restaurants for over 40 years. The Klinkes asked if they could buy an OCB franchise, but were told that OCB was not franchising. Paul Klinke, who was acquainted with Miller, later arranged for one of his former employees, Jack Bickle, to begin working at one of the OCB restaurants.

In March 1991, Scott, who had by now left OCB, again met with the Klinkes and told them that Miller might assist them in opening a buffet restaurant. Paul Klinke contacted Miller and Miller began working with him in April of 1991. Moreover, on March 19, 1991, Paul Klinke had dinner with Bickle and asked Bickle to provide him with OCB recipes and to get his son, Greg, a job as a cook at one of the OCB stores. Paul offered Bickle $60.00, but Bickle refused both the money and the opportunity to perform those services.

Between March 19, 1991 and April 2, 1991, Greg Klinke and Miller discussed the possibility of Greg's obtaining work at one of the OCB restaurants. On April 2, Greg applied for a job as a cook. On his application, however, he did not disclose either his true residence or his experience as a cook working for his parents. Nor did he reveal the fact that he was still on his parents' payroll.

That summer, Miller asked one of Scott's former administrative assistants to help him compile an employee's manual. Miller provided the bulk of the material for the manuals; the district court found that the new manuals were "almost exact copies of OCB position manuals." In August, Miller gave a licensed transcriber a box of recipes to retype and subsequently delivered to the Klinkes what the district court described as the "OCB recipes." The district court found

that when the Klinkes first opened their buffet restaurant, Granny's, they used the copied position manuals to train their employees and the OCB recipes to prepare their dishes. The court granted the Klinkes' motion for summary judgment on the Washington Consumer Protection Act claim, maintaining that the Klinkes' alleged wrongful conduct did not impact the public interest. After a bench trial, it held that neither the recipes nor the job manuals were trade secrets.

## STANDARD OF REVIEW

■ Following a bench trial, the judge's findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. Fed.R.Civ.P. 52(a). *See Price v. United States Navy*, 39 F.3d 1011, 1021 (9th Cir.1994); *Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 384 (9th Cir. 1994).

■ A grant of summary judgment is reviewed de novo. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995); *Jesinger v. Nevada Federal Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Warren*, 58 F.3d at 441.

## DISCUSSION

I. *Trade Secret Status of the Recipes*

■ RCW § 19.108.010(4) defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

In *Boeing Co. v. Sierracin Corp.*, 108 Wash.2d 38, 738 P.2d 665 (1987), the Washington Supreme Court makes the important distinction between copyright law and trade secrets law, noting that "[c]opyright does not protect an idea itself, only its particular expression. . . . By contrast, trade secrets law protects the author's very ideas if they possess *some novelty* and are undisclosed or disclosed only on the basis of confidentiality." *Id.*, 738 P.2d at 674 (emphasis added). OCB argues that novelty is not a requirement for trade secret protection; this contention, however, clearly contradicts Washington law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (federal court exercising jurisdiction on the ground of diversity of citizenship must apply the state law as declared by the highest state court). Moreover, contrary to OCB's assertions, the district court's finding that the recipes were more detailed than those of its competitors does not mandate a finding of novelty, for as is discussed below, the court held that even these detailed procedures were readily ascertainable.

Many of OCB's remaining arguments on appeal appear to misunderstand the logic of the district court's opinion. The district court did *not* hold, as OCB contends, that the recipes were not trade secrets merely because they had their origins in the public domain, but also because many of them were "basic American dishes that are served in buffets across the United States." This finding was certainly not erroneous. The recipes were for such American staples as BBQ chicken and macaroni and cheese and the procedures, while detailed, are undeniably obvious. Thus, this is not a case where material from the public domain has been refashioned or recreated in such a way so as to be an original product, but is rather an instance where the end-product is itself unoriginal.

Furthermore, OCB mischaracterizes the court's holding regarding the extent to which the recipes were readily ascertainable, suggesting that the court denied the recipes trade secret status merely because they could be reproduced. While this is not altogether incorrect, it was the *reason* that the recipes could be reproduced—namely, because they were little more than typical American fare—that led the court to conclude that they were readily ascertainable and thus not entitled to trade secret protection. There is thus no indication that the "defendant by an expenditure of effort might have collected the same information from sources available to the public." *Clark v. Bunker*, 453 F.2d 1006, 1010 (9th Cir.1972); rather, the alleged secrets here at issue were found to be so obvious that very little effort would be required to "discover" them.

OCB's contention that material may be protected by trade secret law even if its origins are in the public domain is thus irrelevant. Not only did the district court hold that the recipes and their procedures had their origins in well-known American cuisine, but it also maintained that in spite of their alleged innovative detail, they "[were] fairly basic" and could easily be discovered by others. This is consistent with the *Boeing* court's assertion that "[a] trade secrets plaintiff need not prove that every element of an information compilation is unavailable elsewhere. . . . Trade secrets frequently contain elements that by themselves may be in the public domain but together qualify as trade secrets." 738 P.2d at 675. The district court here found that the recipes themselves, and not merely their different components or any earlier formulations from which they may have been derived, were readily ascertainable.

The district court further held that the recipes had no independent economic value, a finding OCB fails to address adequately on appeal. OCB's argument focuses only on that portion of the district court's opinion that held that the recipes had no independent value because OCB had not proven that its food offerings were "superior in quality to that of its rivals." This, however, was not the sole basis for the court's holding. The court held that even though OCB food tasted better than that of its rivals and few of its rivals were succeeding, "OCB [had] failed to establish by a preponderance of the evidence

that its rivals [were] not succeeding because of inferior food quality." The court thus notes that there was no demonstrated relationship between the lack of success of OCB's competitors and the unavailability of the recipes, i.e., OCB failed to provide that it necessarily derived any benefit from the recipes being kept secret. The court also noted that "limiting food costs is crucial to the profitability of a buffet" and explained that OCB failed to demonstrate that its recipes play a role in limiting costs.

Further weighing against any finding of economic value was the court's finding that OCB's recipes had to be simplified because of the limited reading skills of its cooks. Given this fact, it appears unlikely that the recipes themselves conferred any economic benefit upon OCB because it was from "translated" versions of these recipes, rather than the highly detailed versions now at issue, that OCB cooks prepared its well-celebrated food.

The district court did not reach the issue of whether the efforts to maintain the secrecy of the recipes were reasonable under the circumstances. OCB contends that the court's factual finding that the recipes were stamped "confidential" mandates a finding that the security efforts were appropriate. As will be discussed below, consideration of whether security efforts were reasonable involves an analysis of a number of factors; OCB's action in stamping them "confidential" may perhaps not be sufficient. Because the recipes lack the requisite novelty and economic value for trade secret protection, however, we need not reach this issue.

II. *Trade Secret Status of the Job Manuals*

■ The district court held that the job manuals were not trade secrets as they were not the subject of reasonable efforts to maintain their secrecy. Commenting upon OCB's security measures, the court observed that "[g]iven the limited tenure of buffet employees, and the fact that they often move from restaurant to restaurant, a company which allows its employees to keep job position manuals cannot be heard to complain when its manuals fall into the hands of its rivals."

We see no error in the district court's ruling. In *Machen Inc. v. Aircraft Design,*

*Inc.,* 65 Wash.App. 319, 828 P.2d 73 (1992), the Washington Court of Appeals cited the Uniform Trade Secrets Act for the proposition that "[r]easonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on a 'need to know basis', and controlling plant access." *Machen,* 828 P.2d at 78. The *Machen* court also notes that "general [protective] measures" may not be enough if they are not "designed to protect the disclosure of information." *Id.* In this matter, the district court's finding that employees were allowed to take the job manuals home and keep them even though they were "supposed to be kept in the manager's office when not being used," directly addresses the reasonableness of OCB's security measures. Even if the manuals were loaned only on a "need-to-know" basis, as OCB claims, the fact that employees were advised of neither the manuals' status as secrets, nor of security measures that should be taken to prevent their being obtained by others, suggests that OCB's interest in security was minimal.

■ The court made no findings concerning whether the manuals were generally known or readily ascertainable, but even a cursory review of them suggests that they fail this prong of the trade secret test as well. The manuals contain little more than such food service truisms as "[w]hen tasting foods, never use a cooking utensils [sic]" and "[f]ollow each recipe exactly." Thus, while it may have been reasonable to conclude that OCB obtained value from the manuals, there is little to suggest that any value was obtained from the manuals being kept secret.

■ Finally, OCB argues that since the Klinkes illegally obtained the manuals, the question of whether the security measures taken to protect them were reasonable is irrelevant. This argument, however, misses the mark, as the issue of whether security measures were reasonable pertains to the preliminary question of whether the material is in fact a trade secret. *See* R.C.W. § 19.108.010(4) (trade secret is information that "is the subject of efforts that are reasonable under the circumstances to maintain its

secrecy"). If it is not, then the Klinkes may be liable for stealing *something,* but they cannot be liable for misappropriation of trade secrets. In addition, *K–2 Ski Co. v. Head Ski Co.,* 506 F.2d 471 (9th Cir.1974), upon which OCB relies in support of its argument that the Klinkes' wrongful conduct precludes any inquiry into the reasonableness of security measures, is inapplicable, as it interpreted Maryland, not Washington law. *K–2 Ski Co.,* 506 F.2d at 473. Thus, we affirm the court's finding that the manuals were not trade secrets.

### III. *Washington Consumer Protection Act Claims*

■ RCW § 19.86.020 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Washington courts, however, have strictly circumscribed the actions that may be brought pursuant to the statute. In *Haner v. Quincy Farm Chemicals,* 97 Wash.2d 753, 649 P.2d 828 (1982) (en banc), the Washington Supreme Court held that in order for a private individual to initiate an action under the Act, "the conduct complained of must: (1) be unfair or deceptive; (2) be within the sphere of trade or commerce, and (3) impact the public interest." *Id.,* 649 P.2d at 830. Granting the Klinkes' motion for summary judgment on the Washington Consumer Protection Act claim, the district court held that there was neither any evidence that "the defendants' conduct [was] likely to injure anyone else," nor was there evidence of a " 'specific legislative declaration of public interest impact.' " *Hangman Ridge Training Stables, Inc., v. Safeco Title Ins. Co.,* 105 Wash.2d 778, 719 P.2d 531, 538 (1986).

While the Klinkes' conduct in this matter was clearly unethical, there is nothing in the record to suggest that "additional plaintiffs have been or will be injured [by the Klinkes] in exactly the same fashion." 719 P.2d at 538. Moreover, the *Hangman* court suggests that the existence of a public interest impact turns in part on whether the plaintiff and defendant were parties to some sort of commercial transaction:

Factors indicating public interest in [the] context [of private disputes] include: (1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions?

*Id.* at 538. While the court notes that "not one of these factors is dispositive, nor is it necessary that all be present," *id.,* the relationship between the parties in this matter does not appear to be of the sort contemplated by the *Hangman* test. Accordingly, we affirm the district court's grant of summary judgment on the Consumer Protection Act claim.

The judgement of the district court is AFFIRMED.